# IN THE SUPREME COURT OF IOWA

No. 06–0557

Filed December 12, 2008

**IN RE THE MARRIAGE OF RANDALL J. SHANKS
AND TERESA E. SHANKS**

**Upon the Petition of
RANDALL J. SHANKS,**

Appellant,

**And Concerning
TERESA E. SHANKS,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Pottawattamie County, Ronald H. Schechtman (validity of prenuptial agreement) and Joel E. Swanson (dissolution decree), Judges.

Spouse seeks further review of a decision of the court of appeals refusing to enforce a premarital agreement. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED WITH INSTRUCTIONS.**

John M. French of Peters Law Firm, P.C., Council Bluffs, for appellant.

James C. Hanks of Ahlers & Cooney, P.C., Des Moines, for appellee.

**HECHT, Justice**.

This case provides the first occasion for this court to determine the validity of a premarital agreement under Iowa Code section 596.8. Upon further review of the court of appeals' affirmance of the district court's order denying a request for specific performance of a premarital agreement, we conclude the agreement was voluntarily executed, conscionable, and enforceable. Accordingly, we vacate the decision of the court of appeals, affirm in part and reverse in part the district court's judgment, and remand this case for further proceedings.

## I.  Background Facts and Proceedings.

Randall Shanks is an attorney with a successful personal injury and workers' compensation practice in Council Bluffs. Teresa Shanks holds an associate degree in court reporting and a Bachelor of Science degree in marketing management. She has been employed in various roles, including a position in the marketing department of a casino, and employment as a bookkeeper, secretary, and office manager in Randall's law office.

Randall and Teresa were married in Jamaica on April 23, 1998. This was a second marriage for both parties. Randall had two children and Teresa had three children from prior marriages. While contemplating marriage, Randall and Teresa discussed Randall's goal of preserving his current and future assets for his children in the event their marriage were to end by his death or a divorce. Randall suggested they enter a premarital agreement, and Teresa agreed, stating she was not marrying Randall for his money.

In late March or early April 1998, Randall drafted a premarital agreement and presented it to Teresa by April 13, ten days before their wedding. The first draft proposed the parties would maintain separate

ownership of their assets acquired before and during the marriage, and provided the parties did not intend to hold jointly-owned property except a marital home and a joint checking account. The draft included a mutual waiver of alimony and provided for the equitable division of only jointly-owned property in the event of a divorce. The draft further contemplated Randall would maintain $500,000 in life insurance coverage on his life, and name Teresa as the beneficiary.

Upon receiving the draft, Teresa asked Randall several questions. He responded to them, but insisted Teresa should seek independent legal advice as to the meaning and legal effect of the proposed agreement. Teresa consulted a friend, who referred her to Edith Peebles, an attorney licensed only in Nebraska. Randall did not know Peebles, but when her office requested a copy of the draft, he revised the document to identify Peebles as the lawyer advising Teresa in the matter.

Peebles requested Lisa Line, an associate in her law firm, review the draft on April 16. Line made several handwritten notations on the document, including an exclamation that the proposed agreement would force Teresa to "waive all rights as spouse!" in Randy's pension assets. When Line realized the prenuptial agreement was between two Iowa residents who planned to reside in Iowa, she suggested Peebles should advise Teresa to have an Iowa-licensed attorney review the document. When they met on April 16, Peebles advised Teresa to seek Iowa-licensed counsel. Peebles's firm charged ninety dollars for the legal services rendered to Teresa.

After her meeting with Peebles on the 16th, Teresa returned the document to Randall and requested he make the changes and

clarifications suggested in Line's handwritten notes.[1]  She did not heed Peebles's advice to seek Iowa counsel.  Randall made some revisions, gave the new draft to Teresa, and again told her to review it with her lawyer.[2]

Despite Randall's urging that she have her lawyer review the revised draft, Teresa did not seek further counsel from Peebles or any other attorney.[3]  Randall attached to the revised agreement separate schedules listing the assets of each party, the parties signed the agreement on April 17, and they departed for Jamaica the next day.  As we have already noted, Randall and Teresa were married in Jamaica on April 23, 1998.

The marriage later failed, and Randall filed a petition requesting its dissolution on November 23, 2004.  Randall sought, and Teresa opposed, enforcement of the premarital agreement.  The district court bifurcated the trial, first taking up the question of the enforceability of the premarital agreement.  After a trial of that matter, the court found

[1]Attorney Lines had written "must change" in the margin at paragraph 59 of the proposed agreement which identified Peebles as the attorney advising Teresa in connection with the premarital agreement.

[2]Among the notable revisions were (1) an acknowledgement that Randall's net worth "may increase as much as twenty-fold during the next twenty years," rather than ten-fold in the coming decade as indicated in the first draft; (2) a disclosure that Randall's law practice included "several significant negligence cases" that were expected to "provide him with fees in excess of $2 million dollars"; (3) inclusion of a more detailed version of a formula allocating between the parties the net value of the marital home in the event of a dissolution or the death of either party; and (4) the addition of a schedule controlling the division of the value of "property purchased by [the parties] after the marriage with funds earned after the marriage," and allocating to Teresa 15% of such value after five years of marriage, 20% after ten years of marriage, 25% after fifteen years of marriage, and 30% after twenty years of marriage.  These revisions authored by Randall responded to some, but certainly not all, of the comments and questions noted by Attorney Line on the first draft of the proposed agreement.  Notably, the revised draft did not delete the name of Edith Peebles as the attorney advising Teresa in the matter.

[3]Teresa chose not to seek counsel from the Iowa-licensed lawyer who represented her in her prior dissolution.

Teresa's execution of the agreement was involuntary, and therefore concluded the accord was unenforceable under Iowa Code section 596.8(1) (providing a premarital agreement is not enforceable if the person against whom enforcement is sought proves the agreement was not executed voluntarily).

Following a subsequent trial on property division, spousal support, and attorney fees, district court dissolved the parties' marriage, divided the marital assets, and awarded Teresa spousal support for a term of only two months. The decree allocated to Teresa assets valued at $86,755 and ordered Randall to pay Teresa a total of $150,000 in three equal installments payable on April 1, 2006, September 1, 2006, and January 1, 2007. The decree made no award for attorney fees beyond the judgment entered earlier against Randall for temporary attorney fees.

Randall appealed, challenging both the ruling denying his request for enforcement of the premarital agreement and the property division ordered in the dissolution decree. Teresa cross-appealed, claiming equity requires for her a more favorable property division, more substantial spousal support, and an additional award for attorney fees. The court of appeals affirmed the district court's decisions in all respects. We granted further review to address the validity of the premarital agreement.

## II. Scope of Review.

Citing our statement in *In re Marriage of Spiegel*, 553 N.W.2d 309, 313 (Iowa 1996), that premarital agreements are construed in the same manner as ordinary contracts, the parties contend our review should be for errors of law as in other contract cases. There was some confusion in the district court as to whether the bifurcated trial on the enforceability of the parties' premarital agreement should be heard in equity or at law. The trial court initially concluded the proceeding would be tried at law,

and therefore ruled on objections lodged by the parties. At the beginning of the second day of the proceeding, however, the district court reversed course, having concluded that at least some of the issues under Iowa Code section 596.8 should be tried in equity. The district court therefore tried the remainder of the proceedings in equity, receiving the evidence subject to the parties' objections.

Dissolution proceedings are equitable actions, which we review de novo. Iowa R. App. P. 6.4. Although in *Spiegel* we noted premarital agreements are construed in the same manner as ordinary contracts, we exercised de novo review of the validity of the agreement at issue in that case. *Spiegel*, 553 N.W.2d at 316 ("On our de novo review we conclude Sara has not carried her burden to show the agreement is unfair."). Thus, the general rule is that issues concerning the validity and construction of premarital agreements are equitable matters subject to our de novo review.[4]

The fact that, at the outset, the district court viewed the enforceability of the premarital agreement as a matter to be tried at law does not control the scope of our review. Although the court ruled on several objections during the first day of the trial, we conclude we will have no difficulty conducting de novo review of the record in this case.

---

[4]Randall cites Iowa Code section 596.9 for the proposition our review is for errors of law. This section provides "[i]n any action under this chapter to revoke or enforce a premarital agreement the issue of unconscionability shall be determined by the court as a matter of law." Iowa Code § 596.9. We do not believe the legislature intended with this language to transform a trial in an otherwise equitable dissolution proceeding into one at law. A court sitting in equity is required to make all necessary factual and legal conclusions, and the requirement that the court determine unconscionability "as a matter of law" does not alter the trial court's traditional role or our scope of review. *Cf.* Dennis I. Belcher & Laura O. Pomeroy, *A Practitioner's Guide for Negotiating, Drafting and Enforcing Premarital Agreements*, 37 Real Prop. Prob. & Tr. J. 1, 14 (2002) (noting section 6(c) of the Uniform Premarital Agreement Act (1983) (after which section 596.9 is modeled) was included in the Uniform Act "because the determination of unconscionability by the court avoids a jury issue").

In only a few instances did the district court's rulings exclude evidence, and in each of them we agree with the court's ruling. As the court reserved ruling on objections after the first day of the trial, we shall review the entire matter de novo. *Sille v. Shaffer*, 297 N.W.2d 379, 381 (Iowa 1980) (concluding claims of title by acquiescence, normally tried in equity, and adverse possession, normally tried in equity, would be reviewed de novo notwithstanding the district court's rulings excluding certain evidence where we were able to review the rulings and agreed with them). We give weight to fact findings of the district court, particularly as to witness credibility, but are not bound by them. Iowa R. App. P. 6.14(6)(*g*).

### III. Discussion.

In Iowa, premarital agreements executed on or after January 1, 1992, are subject to the requirements of the Iowa Uniform Premarital Agreement Act (IUPAA), codified in Iowa Code chapter 596. Iowa Code § 596.12. The IUPAA provides three independent bases for finding a premarital agreement unenforceable:

> A premarital agreement is not enforceable if the person against whom enforcement is sought proves any of the following:
>
> (1)    The person did not execute the agreement voluntarily.
>
> (2)    The agreement was unconscionable when it was executed.
>
> (3)    Before the execution of the agreement the person was not provided a fair and reasonable disclosure of the property or financial obligations of the other spouse; and the person did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other spouse. . . .

*Id.* § 596.8. The IUPAA is modeled after the Uniform Premarital Agreement Act (UPAA), which was drafted by the National Conference of

Commissioners on Uniform State Laws in 1983. *See* Unif. Premarital Agreement Act, 9B U.L.A. 369 (1983). A primary goal of the UPAA was to increase the certainty of enforceability of premarital agreements. *See id.* Prefatory Note at 369. In the absence of instructive Iowa legislative history, we look to the comments and statements of purpose contained in the Uniform Act to guide our interpretation of the comparable provisions of the IUPAA.

**A.  Voluntariness.** The district court found the premarital agreement in this case was not executed voluntarily because Randall, as an attorney, had substantially greater power under the circumstances and Teresa did not receive the advice of independent Iowa counsel. In making that finding, the district court relied on our decision in *Spiegel*, which established that waivers of rights in premarital agreements executed prior to the adoption of the IUPAA are not enforceable if they were not "knowing and voluntary." *Spiegel*, 553 N.W.2d at 315. In *Spiegel*, we undertook a "procedural fairness" analysis to determine whether the agreement was "fairly, freely and understandingly entered into" by the parties. *Id.*

While broad notions of procedural fairness were relevant to our determination of voluntariness challenges to premarital agreements executed prior to January 1, 1992, the IUPAA has significantly altered and clarified the voluntariness inquiry for agreements executed after that date. In contrast to the "knowing and voluntary" test of "procedural fairness" applied in *Spiegel*, section 596.8(1) requires only that the agreement be executed voluntarily.[5] Neither the IUPAA nor the UPAA

---

[5]Although we conclude section 596.8's "voluntariness" requirement does not incorporate the concept of "knowing" execution, this concept is not irrelevant to the determination of enforceability of a premarital agreement under the IUPAA. As we discuss below, under the IUPAA a party's knowing and understanding execution of a premarital agreement is a factor in the procedural unconscionability determination.

defines the term "voluntarily." Black's Law Dictionary defines "voluntarily" as "[i]ntentionally; without coercion." Black's Law Dictionary 1605 (8th ed. 2004). In *Spiegel*, we intimated that a voluntarily executed premarital agreement was one free from duress and undue influence. *Spiegel*, 553 N.W.2d at 317 ("As we discuss more fully below in the divisions dealing with duress and undue influence, Sara signed the agreement voluntarily, albeit reluctantly."). We believe this is the appropriate formulation of the voluntariness inquiry under IUPAA as well. We therefore hold proof of duress or undue influence is required under section 596.8(1) to establish a premarital agreement was involuntarily executed.

Teresa testified she executed the agreement voluntarily. Upon our de novo review, we conclude Teresa failed to establish duress or undue influence.

1. *Duress.* There are two essential elements to a claim of duress in the execution of a contract: (1) one party issues a wrongful or unlawful threat and (2) the other party had no reasonable alternative to entering the contract. *Spiegel*, 553 N.W.2d at 318 (citing *Turner v. Low Rent Hous. Agency,* 387 N.W.2d 596, 598 (Iowa 1986); *In re C.K.,* 315 N.W.2d 37, 43–44 (Iowa 1982)). Here, Randall informed Teresa he would not get married again without a premarital agreement. We rejected the argument that such an ultimatum was wrongful or unlawful in *Spiegel*. Additionally, similar to the bride-to-be in *Spiegel*, Teresa had the reasonable alternative of cancelling the wedding in the face of such a threat. These facts fall far short of a showing of duress sufficient to support a finding that Teresa involuntarily executed the agreement.

2. *Undue influence.* We stated the standard for undue influence in *Spiegel*:

> Undue influence is influence that deprives one person of his or her freedom of choice and substitutes the will of another in its place. "[M]ere importunity that does not go to the extent of controlling the will of the grantor does not establish undue influence." Freedom from undue influence is presumed.

*Spiegel*, 553 N.W.2d at 318 (citations omitted). The district court found Randall's position as a lawyer, and his status as Teresa's fiancée and employer, put Randall in such a position of power over Teresa that she was willing to put her full faith in his judgment in drafting the agreement. Despite the potential for abuse inherent in the parties' complex relationship, we find the evidence presented was insufficient to establish undue influence. Although Teresa testified that Randall subtly encouraged her not to take the second draft to an attorney, the district court found this testimony incredible. We credit the district court's credibility determination and find Randall encouraged Teresa to seek the advice of counsel as to both drafts of the agreement. The facts presented here simply do not demonstrate the "improper or wrongful constraint, machination, or urgency of persuasion" required for a finding of undue influence. *Stetzel*, 174 N.W.2d at 443. We are not persuaded that Randall's will was substituted for Teresa's own judgment in deciding to sign the agreement. *Spiegel*, 553 N.W.2d at 319.

Having found the premarital agreement was not a product of duress or undue influence, we conclude Teresa has failed to prove she executed the agreement involuntarily. We next consider whether the agreement is unconscionable and therefore unenforceable.

**B. Unconscionability.** While the IUPAA largely adopts the provisions of the UPAA verbatim, section 596.8(1) of the IUPAA differs from the UPAA in two important particulars. First, the UPAA allows a party to modify or eliminate spousal support in a premarital agreement,

as long as the modification or elimination does not cause the other party to be eligible for public assistance at the time of enforcement. Unif. Premarital Agreement Act § 6(a)(2), 9B U.L.A. at 376. The IUPAA, on the other hand, prohibits premarital agreements from adversely affecting spousal support. Iowa Code § 596.5(2). Thus, the district court correctly concluded the purported alimony waiver in this premarital agreement is invalid and unenforceable.[6]

Second, under UPAA section 6(a)(2), a court may not consider the alleged unconscionability of the agreement unless it first finds there was no fair and reasonable financial disclosure, voluntary waiver of such disclosure, *and* the challenging party did not have, or reasonably could not have had an adequate knowledge of the other party's property and financial obligations. Unif. Premarital Agreement Act § 6(a)(2), 9B U.L.A. at 376. As noted by the Supreme Court of California, section 6 of the UPAA was intended to

> enhance the enforceability of premarital agreements and to convey the sense that an agreement voluntarily entered into would be enforced without regard to the apparent unfairness of its terms, as long as the objecting party knew or should have known of the other party's assets, or voluntarily had waived disclosure.

*In re Marriage of Bonds*, 5 P.3d 815, 824 (Cal. 2000) (citing National Conference of Commissioners on Uniform State Laws, Proceedings in Committee of the Whole, Unif. Premarital Agreement Act (July 23–26, 1983) at 49–97).

In contrast to the UPAA approach, unconscionability alone is sufficient to render a premarital agreement unenforceable under the

---

[6]As our disposition of this appeal includes a reversal and a remand to the district court for the enforcement of the parties' premarital agreement, the district court shall revisit the subject of spousal support and enter an appropriate order under the circumstances.

IUPAA, notwithstanding fair and reasonable financial disclosure. Iowa Code § 596.8(2). By bifurcating the unconscionability and disclosure considerations, we believe the Iowa General Assembly rejected the choice made by the UPAA's drafters to permit challenges based on unconscionability only if appropriate financial disclosures are not made and the other spouse lacked such knowledge. Under the IUPAA, courts may address unconscionability claims whether or not appropriate financial disclosures are made. One commentator has described Iowa's modification of the UPAA's enforcement provision as being a "less rigorous" approach to enforceability of premarital agreements. Barbara Ann Atwood, *Ten Years Later: Lingering Concerns About the Uniform Premarital Agreement Act,* 19 J. Legis. 127, 154 n.130 (1993). While section 596.8(2) grants Iowa courts somewhat greater latitude to conduct a "fairness review" of a premarital agreement than the UPAA, we believe the review contemplated by section 596.8(2) is not as searching as that performed by the district court in this case. Review of premarital agreements for "unconscionability" is substantially more circumscribed than review for mere inequity.

Neither the IUPAA nor the UPAA attempts to define "unconscionability" in the context of premarital agreements. The comment to UPAA section 6 indicates the concept is patterned after section 306 of the Uniform Marriage and Divorce Act (UMDA), which states:

> . . . The standard of unconscionability is used in commercial law, where its meaning includes protection against one-sidedness, oppression, or unfair surprise, and in contract law. . . . In the context of negotiations between spouses as to the financial incidents of their marriage, the standard includes protection against overreaching, concealment of assets, and sharp dealing not consistent with the obligations of marital partners to deal fairly with each other.

> In order to determine whether the agreement is unconscionable, the court may look to the economic circumstances of the parties resulting from the agreement, and any other relevant evidence such as the conditions under which the agreement was made, including the knowledge of the other party. . . .

Unif. Marriage & Divorce Act § 306, Comm'r Note (1973) (citations omitted). The UPAA and IUPAA narrow the temporal focus of the unconscionability analysis to the time "when [the agreement] was executed." *See* Unif. Premarital Agreement Act § 6(a)(2), 9B U.L.A. at 376; Iowa Code § 596.8(2).

In the commercial context, we have noted a "bargain is said to be unconscionable at law if it is 'such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.' " *Casey v. Lupkes*, 286 N.W.2d 204, 207 (Iowa 1979) (citing *Hume v. United States*, 132 U.S. 406, 411, 10 S. Ct. 134, 136, 33 L. Ed. 393, 396 (1889)). Neither this court nor the legislature has attempted to precisely define the term "unconscionable" in the context of commercial contracts. *Smith v. Harrison,* 325 N.W.2d 92, 94 (Iowa 1982) (citing 15 S. Williston, A Treatise on the Law of Contracts § 1763A (3d ed. W. Jaeger 1972)). In considering claims of contractual unconscionability, we examine the factors of "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.*, 227 N.W.2d 169, 181 (Iowa 1975). It is not sufficient that a party made an imprudent bargain:

> People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the

> enforcement of the terms of a contract so unconscionable that no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.

*Smith*, 325 N.W.2d at 94 (citing *Carlson v. Hamilton*, 332 P.2d 989, 990–91 (Utah 1958)).  The Restatement (Second) of Contracts provides further explanation of the concept of unconscionability:

> A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party.  *But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms.*  Factors which may contribute to a finding of unconscionability in the bargaining process include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors.

Restatement (Second) of Contracts § 208 cmt. d (1981) (emphasis added); *accord C & J Fertilizer, Inc.*, 227 N.W.2d at 180 (quoting similar language from Restatement (Second) of Contracts § 234 cmt. d (Student Ed., Tentative Drafts Nos. 1–7, 1973)).

The concept of unconscionability includes both procedural and substantive elements.  *C & J Fertilizer, Inc.*, 227 N.W.2d at 181; *accord Rite Color Chem. Co. v. Velvet Textile Co.*, 411 S.E.2d 645, 648–49 (N.C. Ct. App. 1992).  Procedural unconscionability generally involves employment of "sharp practices[,] the use of fine print and convoluted language," as well as "a lack of understanding and an inequality of

bargaining power." *Rite Color Chem. Co.*, 411 S.E.2d at 648. A substantive unconscionability analysis focuses on the "harsh, oppressive, and one-sided terms" of a contract. *Id.*

Although we have not adopted a precise definition of "unconscionability," the foregoing discussion illustrates the concept is not a means by which a party may escape the requirements of an unfavorable contract after experiencing buyer's remorse. Thus, absent an unconscionable bargaining process, a court should be hesitant to impose its own after-the-fact morality judgment on the terms of a voluntarily executed premarital agreement.

Before examining the procedural circumstances surrounding the execution of the agreement at issue in this case, we first look to whether the terms of the agreement are so harsh or oppressive "such as no [person] in [their] senses and not under delusion would make" such a bargain. *Casey*, 286 N.W.2d at 207.

1. *Substantive unconscionability.* At the outset, we acknowledge premarital agreements are typically financially one-sided in order to protect the assets of one prospective spouse. Courts must resist the temptation to view disparity between the parties' financial circumstances as requiring a finding of substantive unconscionability. *Spiegel*, 553 N.W.2d at 316 (noting this court's refusal to interfere with the parties' freedom of contract by declaring a one-sided premarital agreement void per se); *accord Adams v. Adams*, 603 S.E.2d 273, 275 (Ga. 2004) ("That the antenuptial agreement may have perpetuated the already existing disparity between the parties' estates does not in and of itself render the agreement unconscionable when, as here, there was full and fair disclosure of the assets of the parties prior to the execution of the agreement, and Wife entered into the agreement fully, voluntarily,

and with full understanding of its terms after being offered the opportunity to consult with independent counsel."). As in our pre-chapter 596 jurisprudence, the focus of the substantive unconscionability analysis is upon whether "the provisions of the contract are mutual or the division of property is consistent with the financial condition of the parties at the time of execution." *Spiegel*, 553 N.W.2d at 316.

The district court found the agreement executed by Randall and Teresa was not substantively unconscionable. We agree. Most, but not all, of the provisions of the agreement are mutual in scope. The agreement basically sought to maintain the parties' premarital assets as separate property and to perpetuate their premarital financial conditions throughout the marriage. The parties agreed to maintain separate property during the marriage, with the exceptions of a marital home and a joint checking account. Any property acquired by either party in their sole name during the marriage was to remain separate property. The parties' earnings during the marriage were to remain separate, except to the extent they were deposited in the joint checking account.

The agreement specifically provides for the allocation of any jointly-owned property in the event of a dissolution. The accord dictates such property will be allocated between the parties in different percentages depending on the nature of the property and the length of the marriage. As we have noted, the marital home was among the assets the parties expected to own jointly.[7] The agreement establishes a formula to allocate

---

[7]The record discloses the real estate which became the marital home was owned by Randall at the time of the marriage. We understand the title to that asset remained in Randall's name at the time of the trial of this matter. The premarital agreement contains no express provision requiring the marital home to be titled in both parties' names. The district court declined to enforce the premarital agreement, and therefore made no attempt to allocate the value of this asset. As our decision remands this case

eighty percent of the net value of the home to Randall and the remaining twenty percent to Teresa in the event of a dissolution.[8]  Other property purchased with marital funds is to be distributed consistent with a schedule that is based on the duration of the marriage (e.g., Teresa would receive fifteen percent of such property after five years, twenty percent after ten years, and thirty percent after twenty years).  While these provisions clearly contemplated the allocation of a greater portion of the marital assets to Randall than Teresa, we believe they were at least consistent with the parties' financial conditions at the time of the marriage, and were not so oppressive to Teresa as to justify a finding of unconscionability.

Additionally, although Teresa unilaterally waived any marital interest in certain assets (such as Randall's retirement assets), she also derived some potential benefits under the agreement.  First, she received a potential benefit under the provision that required her to provide as little as six percent of the total initial investment in the home, but entitled her to receive twenty percent of any net proceeds in the event of a dissolution.  The agreement also required Randall to purchase and maintain $500,000 of life insurance, with Teresa named as beneficiary

_____

for enforcement of the agreement, the district court shall adjudicate any dispute as to the parties' respective legal and equitable interests in the real estate or in the proceeds from its sale under the agreement.

[8]This allocation specifically applies only to that portion of the value, if any, of the home in excess of each party's contribution to the cost of the construction of the home. Prior to the marriage, Randall invested more than $100,000 in the construction of the home.  The premarital agreement expressly contemplated that Randall would invest up to $150,000 of additional funds and Teresa would contribute $15,000 from the sale of her premarital home to complete the initial improvements and financing on the structure.  In the event of a dissolution, the premarital agreement provided the parties would first recoup these initial financial investments in the construction and financing of the home before the allocation to the parties of any excess value.  Teresa also committed in the premarital agreement to pay $500 a month as her share of the home mortgage payments.

during the marriage. Finally, although she waived any right to Randall's estate including the elective share of a surviving spouse, the premarital agreement provided that upon Randall's death during the marriage, Teresa would be involved in the wind-up of Randall's law practice, and she would receive a percentage of the value of the practice at the time of its liquidation. Because the agreement contemplated leaving both parties substantially in the same financial condition as they were before the marriage, included primarily mutual covenants and obligations, and provided for some potential financial benefits to Teresa, we conclude the agreement was not unduly harsh or oppressive, and therefore was not substantively unconscionable.

2. *Procedural unconscionability.* As previously noted, the primary focus of the procedural unconscionability inquiry is the advantaged party's exploitation of the disadvantaged party's lack of understanding or unequal bargaining power. Courts have found the following factors, among others, are relevant to procedural unconscionability: the disadvantaged party's opportunity to seek independent counsel, *Friezo v. Friezo*, 914 A.2d 533, 551–57 (Conn. 2007); the relative sophistication of the parties in legal and financial matters, *id.* at 555–57; the temporal proximity between the introduction of the premarital agreement and the wedding date, *Lutgert v. Lutgert*, 338 So. 2d 1111, 1114–16 (Fla. Dist. Ct. App. 1976); the use of highly technical or confusing language or fine print, *Rite Color Chem. Co.*, 411 S.E.2d at 648; and the use of fraudulent or deceptive practices to procure the disadvantaged party's assent to the agreement, *Marsh v. Marsh*, 949 S.W.2d 734, 741 (Tex. Ct. App. 1997).

In holding the agreement procedurally unconscionable, the district court stressed the fact that Randall is an attorney and therefore was in a

vastly superior bargaining position to Teresa. It appears the district court believed there are no circumstances under which an attorney could enter into an enforceable premarital agreement with a spouse who is not represented by independent legal counsel. Although any doubt as to the conscionability of the agreement at issue in this case could have likely been avoided if both parties had been represented by competent Iowa-licensed counsel, we conclude such legal representation is not a condition of enforceability under section 596.8(2). While Randall certainly had greater inherent bargaining power as both the party whose assets were primarily protected by the agreement and as an attorney, he twice insisted Teresa should seek the advice of counsel in connection with the agreement. Attorney Peebles also urged Teresa to do so. The anti-paternalistic notions underlying the IUPAA lead us to conclude Teresa's decision to forego her opportunity to seek further legal advice after her conference with attorney Peebles is a choice that emasculates her unconscionability claim. Equitable principles will not permit a party to eschew an opportunity to consult counsel as to the legal effect of a proposed contract, execute the contract, and then challenge the enforceability of the agreement on the ground she did not have adequate legal advice.

Temporal considerations can in some instances support a finding of unconscionability. Although Randall presented the agreement only ten days before the wedding date, Teresa had sufficient time to consider the implications of the agreement and an opportunity to seek advice of counsel. Indeed, Teresa actually sought, and to some extent received, legal advice from Edith Peebles as to the implications of the first draft of the agreement. Despite Randall's urging, she unilaterally declined to seek additional advice on the revised draft.

The district court found Teresa is not an unsophisticated party:

> Teresa is an intelligent lady. She knew the blight caused by divorce as she had experienced it. She was a college graduate with extraordinarily good marks. Teresa was a court reporter by training and conversant with legalese. She had been a paralegal. Though she had not been exposed to the subject of premarital agreements, she was familiar with people contracting, waiving, and releasing their rights, particularly in the bodily injury field.

Teresa's failure to obtain legal counsel was a product of her own refusal to do so despite serial encouragements from both Randall and attorney Peebles. Teresa's failure to heed the recommendations of others to consult counsel was not a result of impropriety on Randall's part, and does not weigh in favor of a finding of unconscionability. *See In re Marriage of Pownall*, 5 P.3d 911, 915 (Ariz. Ct. App. 2001) ("[Wife] should not be permitted to decline the opportunity to protect herself then later claim that the parties were not on equal bargaining terms. Nor was it Husband's attorney's duty to explain the nature or value of the rights Wife was relinquishing. He explained that he was not her attorney and that he represented only Husband's interest.").

Finally, Randall communicated to Teresa his desire for a premarital agreement to protect his assets for his children. Teresa responded that she was not marrying Randall for his money, and acted accordingly by acquiescing, without thorough investigation or objection, to a premarital agreement that facilitated her marriage. Teresa's words and actions demonstrate she placed higher value on marriage and Randall's companionship than the opportunity for greater financial security. "Buyer's remorse" will not excuse Teresa's voluntary relinquishment of her marital property rights.

Although Randall's vastly superior legal knowledge and stronger financial position posed a danger that such advantages would be abused,

we find no abuse occurred in this case. Randall insisted that Teresa consult her own counsel. Although she ultimately chose not to seek the advice of a lawyer licensed to practice law in the state of Iowa, we cannot say this choice or her assent to the premarital agreement were the products of any unconscionable conduct or tactic of Randall. We find Teresa has failed to demonstrate the agreement was unconscionable.

**C. Financial Disclosure.** When the parties executed the agreement, schedules listing the parties' respective assets and their approximate value were attached. Teresa nonetheless contends the agreement is unenforceable under Iowa Code section 596.8(3) because Randall failed to provide her with fair and reasonable disclosure of his property and financial obligations. The district court rejected this assertion, finding Teresa was sufficiently knowledgeable about Randall's financial circumstances to satisfy the IUPAA. We agree. Section 596.8(3) requires only "fair and reasonable" disclosure, or that the party could have had "adequate knowledge" of the other party's property and financial obligations. This statutory standard is consistent with Iowa law extant at the time of the adoption of the IUPAA. *See Spiegel*, 553 N.W.2d at 317 ("We have never required that a party have precise valuations of the other's assets; a general knowledge of the true nature and extent of the other's properties is sufficient."). In addition to the knowledge she derived from the property schedules attached to the agreement, Teresa learned generally of Randall's properties and his earning capacity through her employment as Randall's paralegal and secretary.

Teresa contends Randall's disclosure was inadequate because she was not provided full access to his personal bank account and pension information. Section 596.8(3) does not impose such an exacting standard. We agree with the district court that Randall's financial

disclosure was fair and reasonable and that Teresa had sufficient knowledge of Randall's financial situation to understand the consequences of her waiver of a marital interest in Randall's property.

**IV. Conclusion.**

Teresa has failed to carry her burden to prove the premarital agreement is unenforceable under Iowa Code section 596.8. Accordingly, we vacate the decision of the court of appeals, affirm the dissolution of the parties' marriage, reverse the district court's order denying enforcement of the premarital agreement, and remand this case for further proceedings consistent with this opinion.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED WITH INSTRUCTIONS.**

All justices concur except Baker, J., who takes no part.