**IN THE COURT OF APPEALS OF IOWA**

No. 22-0084
Filed March 8, 2023

**IN RE THE MARRIAGE OF JOANN L. BARTEN
AND TROY T. BIGELOW**

**Upon the Petition of
JOANN L. BARTEN,**
          Petitioner-Appellee/Cross-Appellant,

**And Concerning
TROY T. BIGELOW,**
          Respondent-Appellant/Cross-Appellee.
_____

          Appeal from the Iowa District Court for Story County, James M. Drew,

Judge.


          Troy Bigelow appeals and JoAnn Barten cross-appeals the economic

provisions of the decree dissolving their marriage. **AFFIRMED AS MODIFIED.**


          Joseph R. Cahill of Cahill Law Offices, Nevada, for appellant.

          Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellee.


          Heard by Vaitheswaran, P.J., and Greer and Chicchelly, JJ.

**CHICCHELLY, Judge.**

Troy Bigelow appeals and JoAnn Barten cross-appeals the economic provisions of the decree dissolving their marriage. Troy challenges the validity of the parties' premarital agreement, and both parties challenge property division. Following a de novo review, we agree the premarital agreement is valid and enforceable. We affirm the dissolution decree but modify the value assigned to some of the marital property.

**I. Background Facts and Proceedings.**

JoAnn is an attorney in private practice. She began practicing law in 1999 and opened her own firm in 2005. JoAnn entered the marriage owning two commercial real estate properties: (1) the building in which her law firm is located and (2) a duplex that earns rental income. At the time of marriage, the net equity value of the commercial building was less than $1500 and the net equity of the duplex was about $30,000. During the marriage, both mortgages were extinguished and the value of each property increased. At the time of dissolution, the net equity increased to $529,000 for the commercial building and $162,000 for the duplex.

Troy is a veterinarian and works for the United States Department of Agriculture. When the parties married, Troy owned a home worth $214,500 that was encumbered by a $170,704 mortgage. During the marriage, he sold the home and used the proceeds to buy ten acres of property. After the Iowa Department of Transportation took the property under eminent domain, Troy bought the home that became the marital residence. The home is appraised at $750,000 with no encumbrance.

The parties planned to elope during a trip to Las Vegas in November 2009. It was the second marriage for each. JoAnn told Troy she wanted a premarital agreement to protect their assets, and Troy provided JoAnn a list of his assets and debts in the weeks leading up to their Las Vegas trip. JoAnn drafted the premarital agreement and signed it on October 24, 2009. She emailed the document to Troy on October 27. They planned to leave for Las Vegas on October 30.

JoAnn told Troy that he should consult with an attorney about the premarital agreement. Troy contacted the attorney representing him in a personal injury case, but that attorney told Troy that he did not specialize in premarital agreements and advised him to seek counsel from another attorney. Instead, Troy signed the agreement on October 29 without obtaining independent legal advice.

The premarital agreement lists the property each party owned before marrying and its value. The property is divided into three categories.[1] The agreement states that property listed under categories A1 and B1 is protected from all claims by the other party and not subject to division. That property includes the parties' vehicles, personal property, commercial property and accounts, and professional property and accounts. For property listed under categories A2 and B2, the agreement protects the equity value of each asset at the time the parties signed the agreement but provides any increase in that value during the marriage is divisible as marital property. The property listed under A2 and B2 includes the parties' retirement accounts, personal bank accounts, and residential real estate.

---

[1] Numbers are used to differentiate the categories of property and letters are used to designate the owner of the property. Troy's premarital property and debts are listed under A1, A2, or A3, while JoAnn's are listed under B1, B2, or B3.

Any unsecured debts owed at the time the agreement was signed are listed under categories A3 and B3. The premarital agreement provides that those debts would remain the debts of the individual and neither party is entitled to a setoff for any extinguished during the marriage. The total net worth for Troy at the time of marriage was $229,214.[2] JoAnn had a negative net worth of $18,811.[3]

JoAnn and Troy jointly acquired real estate during the marriage. They bought an apartment building for rental income and a commercial lot. Troy managed and maintained these properties, along with JoAnn's premarital properties. Troy also started a side business hauling pigs to slaughterhouses in 2019 called Big Bart Logistics (Big Bart).

JoAnn petitioned to dissolve the marriage in May 2020. The focus of the trial was the enforceability of the premarital agreement and the division of marital property. The district court determined the agreement was enforceable and divided the premarital property under its terms. It also divided the property acquired during the marriage. After both parties moved to enlarge or amend the decree, the court amended the decree to correct errors and miscalculations. As calculated in the amended decree, Troy received net marital assets valued at $1,048,565.50 and JoAnn receiving net marital assets valued at $986,686.50.

---

[2] The total equity value of Troy's premarital property was $23,875 under A1, $212,955 under A2, and -$7616 under A3.

[3] The total equity value of JoAnn's premarital property was $30,364 under B1, $51,289 under B2, and -$93,855 under B3.

**II. Scope of Review.**

We review dissolution proceedings de novo. *In re Marriage of Shanks*, 758 N.W.2d 506, 510 (Iowa 2008). This scope of review also applies to determinations about the validity of a premarital agreement. *Id.* at 510–11.

**III. Premarital Agreement.**

We first address Troy's challenge to the premarital agreement. Iowa law generally favors premarital agreements. *See In re Marriage of Gonzalez*, 561 N.W.2d 94, 96 (Iowa Ct. App. 1997). There are only three circumstances in which a premarital agreement is not enforceable:

> a. The person did not execute the agreement voluntarily.
> b. The agreement was unconscionable when it was executed.
> c. Before the execution of the agreement the person was not provided a fair and reasonable disclosure of the property or financial obligations of the other spouse; and the person did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other spouse.

Iowa Code § 596.8(1) (2020). Troy contends the premarital agreement is not enforceable under Iowa Code section 596.8(1)(b) because it is procedurally and substantively unconscionable. *See Shanks*, 758 N.W.2d at 515 ("The concept of unconscionability includes both procedural and substantive elements.").

**A. Procedural unconscionability.**

Procedural unconscionability occurs when one party exploits another's lack of understanding or unequal bargaining power. *Id.* at 517.

> Courts have found the following factors, among others, are relevant to procedural unconscionability: the disadvantaged party's opportunity to seek independent counsel, the relative sophistication of the parties in legal and financial matters, the temporal proximity between the introduction of the premarital agreement and the wedding date, the use of highly technical or confusing language or

fine print, and the use of fraudulent or deceptive practices to procure the disadvantaged party's assent to the agreement.

*Id.* (internal citations omitted).

Troy cites several factors that he claims render the premarital agreement procedurally unconscionable. He notes that JoAnn was an attorney and drafted the agreement while he was unrepresented. He points to the limited time he had to review the agreement and obtain counsel, as JoAnn emailed him the agreement only three days before they left for Las Vegas. He argues that under this abbreviated timeline, he was unable to obtain independent counsel to review the agreement and advise him. Instead, he claims that he detrimentally relied on JoAnn's assurance that the agreement she drafted was fair to both parties.

The circumstances under which Troy entered the premarital agreement were less than ideal. As an attorney and the person who drafted the agreement, JoAnn had more insight into its terms and provisions than Troy, an unrepresented layperson. We also note that based on the date of her signature on the document, JoAnn finished drafting the premarital agreement at least three days before she emailed it to Troy. Because they planned to fly to Las Vegas on October 30 and marry on November 1, Troy had just slightly more than two days to get the agreement reviewed by independent counsel. Certainly, his likelihood of obtaining independent legal advice would have increased if JoAnn had emailed the document to him on the day that she signed it.

But while the less-than-ideal circumstances surrounding the signing of the agreement give us some pause, we do not find that they amount to procedural unconscionability. Our supreme court has made clear that a premarital agreement

is not unconscionable simply because one party is an attorney and the other party is unrepresented. *See id.* at 518 (stating that "legal representation is not a condition of enforceability" under section 596.8). That JoAnn urged Troy to obtain independent legal advice before signing the agreement weighs against an unconscionability finding. Troy claims he was not afforded enough time to obtain an independent review, which can support an unconscionability claim. *See id.* ("Temporal considerations can in some instances support a finding of unconscionability."). Although Troy was afforded considerably less time than the ten days that was found sufficient in *Shanks*, *id.*, he had enough time to consult his own attorney. Nothing in the record shows he made any attempt to do so after his personal injury attorney declined to advise him.[4] That failure will foreclose on an unconscionability claim. *See id.* at 518 ("Equitable principles will not permit a party to eschew an opportunity to consult counsel as to the legal effect of a proposed contract, execute the contract, and then challenge the enforceability of the agreement on the ground she did not have adequate legal advice."); *In re Est. of Kloster*, No. 20-1245, 2021 WL 3076546, at *2 (Iowa Ct. App. July, 21, 2021) (denying claim of procedural unconscionability based on premarital agreement that

---

[4] Troy's testimony on this matter is limited:

> Q. And when did you first lay eyes on a prenuptial agreement?
> A. JoAnn sent it to me for review on October 27th.
> Q. And when you say she sent it to you for review, was that by way of handing to you or email? A. Email. She sent it to me in email October 27th.
> . . . .
> Q. Did you get any legal counsel concerning this prenup?
> A. Mark was a personal injury attorney I had at that time, because I had gotten hit by a car riding bicycle, and Mark informed me . . . he's a personal injury attorney and not an expert in this.
> Q. So you didn't get any legal advice concerning— A. No.

was presented and signed one day before marriage when the party making the claim failed to read the agreement or review it with independent legal counsel).

In reaching our conclusion that the agreement was not procedurally unconscionable, we also note that the premarital agreement was not a surprise as Troy testified that JoAnn "mentioned prior to marriage that she would ask me to sign a prenup" and he provided her with a list of his assets in the weeks leading up to their trip for the purpose of drafting one. *See In re Est. of Rhoten*, No. 18-0573, 2019 WL 1056831, at *4 (Iowa Ct. App. Mar. 6, 2019) (finding no procedural unconscionability because a party "had the opportunity to seek independent counsel during the four and one-half days between when she received the premarital agreement on Monday evening to when she got married on Saturday" and the parties had discussed signing one so there was no surprise when it was presented). Even if Troy did not understand the terms of the premarital agreement, he understood the nature of the document and what it purported to do. If he had concerns about the fairness of the agreement, he did not need to rely on JoAnn's statements about it. Despite the parties' plan to marry on November 1, Troy was under no obligation to follow through. *See In re Marriage of Spiegel*, 553 N.W.2d 309, 317 (Iowa 1996) (stating that presenting a premarital agreement just before wedding to put pressure on the other party "may be criticized as unkind, but cannot be deemed illegal"). There is less pressure in delaying an out-of-state elopement than an elaborate wedding ceremony for family and friends. For these reasons, Troy has failed to show the agreement was procedurally unconscionable.

**B. Substantive unconscionability.**

We next turn to the question of substantive unconscionability. "A substantive unconscionability analysis focuses on the 'harsh, oppressive, and one-sided terms' of a contract." *Shanks*, 758 N.W.2d at 515 (citation omitted). Because "premarital agreements are typically financially one-sided in order to protect the assets of one prospective spouse," our supreme court has cautioned us to "resist the temptation to view disparity between the parties' financial circumstances as requiring a finding of substantive unconscionability." *Id.* at 516. Instead, "the focus of the substantive unconscionability analysis is upon whether 'the provisions of the contract are mutual or the division of property is consistent with the financial condition of the parties at the time of execution.'" *Id.* (citation omitted).

Troy argues the agreement was not mutual because the categorization of the assets benefited JoAnn. For example, he notes that the real estate the parties owned when they married was not treated the same. JoAnn's real estate was listed as B1 and is not divisible, while Troy's real estate was listed as A2 and any increase in equity during the marriage is divisible. But the premarital agreement does not categorize assets so broadly. Instead, property is categorized by use. Because JoAnn's real estate consisted of commercial property, it was listed with the parties' commercial and professional property under categories A1 and B1. In contrast, Troy owned his personal residence, which was listed along with the parties' personal financial accounts under categories A2 and B2. In this way, the agreement was consistent in its categorization of the parties' property.

Troy also argues substantive unconscionability is shown because the property division "is not consistent with the financial condition of the parties" at the

time the parties signed the premarital agreement. He notes that the net worth of his assets far exceeded JoAnn's negative net worth at the time of marriage.[5] He complains that the value of JoAnn's assets increased substantially because she convinced him to use his financial resources and construction skill to improve her real estate while he retains none of that benefit.

The premarital agreement is clear that the property listed as A1 and B1 remains the property of the party bringing it into the marriage; the other party would have no claim for reimbursement resulting from "efforts to preserve, increase, maintain, improve, sell, trade or convey" the property. Troy undertook these efforts despite signing the agreement. Although he now perceives a disparity, we judge the validity of the agreement at the time it was executed rather than when enforcement is sought. *See Gonzalez*, 561 N.W.2d at 96. The agreement was not unconscionable when the parties signed it. Troy may regret his decision now, but that regret does not make the agreement unconscionable. *See Shanks*, 758 N.W.2d at 515 ("It is not sufficient that a party made an imprudent bargain . . . ."); *see also id.* at 516–17 (stating the concept of unconscionability "is not a means by which a party may escape the requirements of an unfavorable contract after experiencing buyer's remorse").

**C. Conclusion.**

The premarital agreement was not obtained by "sharp practices" like "the use of fine print and convoluted language" or "a lack of understanding and an

---

[5] The debts JoAnn owed at the time of marriage exceeded the net value of her combined assets largely because of the amount she owed in student loans, which exceeded $50,000.

inequality of bargaining power." *Id.* at 515 (citation omitted). Nor was it oppressively one-sided. *Id.* Troy has not met his burden of showing the agreement is unconscionable. We affirm the district court's ruling finding it valid and enforceable.

**IV. Property Division.**

Having found the premarital agreement enforceable, we turn to the parties' claims that the property division is inequitable. We begin by noting the guiding principles of property division:

> Iowa is an equitable division state. An equitable division does not necessarily mean an equal division of each asset. Rather, the issue is what is equitable under the circumstances. The partners in the marriage are entitled to a just and equitable share of the property accumulated through their joint efforts. Iowa courts do not require an equal division or percentage distribution. The determining factor is what is fair and equitable in each circumstance. The distribution of the property should be made in consideration of the criteria codified in Iowa Code section 598.21(5). While an equal division of assets accumulated during the marriage is frequently considered fair, it is not demanded.

*In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009).

**A. Troy's claims.**

Troy complains that he should receive a larger share of the property distribution because he entered the marriage with a larger net worth. He states that most caselaw involves a party with greater assets "foisting" a premarital agreement on a party with a small or negative net worth while the facts before us are "just the opposite." His argument rehashes his unconscionability argument. As stated above, we find no merit to his claim.

The provisions of the premarital agreement extinguish most of Troy's arguments. For instance, Troy wants to receive compensation for contributions he

made that increased the value of JoAnn's premarital property and extinguished her premarital debt. But the premarital agreement explicitly provides that he is not entitled any credit for contribution to the increase in equity of property listed in B1 or to set off for payment of any debts listed in B3. By signing the premarital agreement, Troy entered a contract by which he forfeited property he may otherwise have been entitled to. *See Gonzalez*, 561 N.W.2d at 96 (stating that we treat premarital agreements "in the same manner as ordinary contracts").

In the same vein, Troy also seeks to increase his share of the marital property based on his greater financial contribution during the marriage and the "sweat equity" he spent managing and maintaining the property acquired during the marriage. The supreme court has rejected similar arguments for reimbursement:

> It is important to remember marriage does not come with a ledger. Spouses agree to accept one another "for better or worse." Each person's total contributions to the marriage cannot be reduced to a dollar amount. Many contributions are incapable of calculation, such as love, support, and companionship. "Financial matters . . . must not be emphasized over the other contributions made to a marriage in determining an equitable distribution."

*In re Marriage of Fennelly*, 737 N.W.2d 97, 103–04 (Iowa 2007) (internal citation omitted).

Troy complains that the district court failed to set aside the $251,830 net equity value of the assets listed in A1 and A2, which he argues he is entitled to under the premarital agreement. But the district court did not include any of the assets listed as A1 in the property division, so there is no need to set off the equity value of those assets. For the property listed as A2 or B2, the premarital agreement states that the net value of the property at the time of marriage should

be set off from the property distribution even if "the property is sold, transferred, traded or conveyed, and a new form of property is obtained" during the marriage. It appears the district court set off these amounts from most of the property listed in A2 and B2. But we do not find a setoff for the $43,796 in net equity for the residence that Troy brought into the marriage.[6] That property was sold, and the proceeds were used first to buy ten acres of land and later the residence that became the marital home. The marital home was awarded to Troy, but he did not receive a credit for the $43,796 he brought into the marriage and later used to buy it. We modify the decree to set off $43,796 from the marital property, reducing the total value of Troy's share of the marital property by that amount.

Finally, Troy complains that the court failed to include some property in the property distribution:

| | Value |
|---|---|
| 2013 Chevrolet pickup truck | $27,000 |
| Ex Mark Turning Mower | $7199 |
| Finish Line 5th Wheel Trailer | $8900 |
| Bobcat Skid Steer | $31,565 |
| 2018 Tesla Model 3 | $48,000 |
| Miscellaneous items | $12,104 |

These items are owned by the limited liability corporations that own JoAnn's commercial real estate. Because the real estate is classified as separate property in the premarital agreement, the district court agreed the corporations and the property they own belong to JoAnn and did not include it in the marital distribution.[7]

---

[6] The proceeds from the sale of that home were later used in purchasing the marital home, which the court awarded to Troy.

[7] The court made an error in the original decree by mistaking JoAnn's transfer of a different property as a transfer of an undivided one-half interest in the rental real estate to Troy. As a result, the court at first considered the rental real estate as

We agree that this property is not marital property subject to division. JoAnn testified that she purchased the disputed items with rental income and profits from the real estate she brought into the marriage. The premarital agreement states that premarital property, including "all interest, rents and profits" derived from it, remains in the sole ownership of the party who brought it into the marriage. It also states that any new form of property obtained from the premarital property maintains the same status as if it were originally listed as premarital property in the parties' agreement.

**B. JoAnn's claims.**

JoAnn contends the court made two errors in determining the net value of the marital assets awarded to each party. Both errors concern the valuation of Big Bart, the business Troy started in 2019. JoAnn seeks an equalization payment to balance the inequities she believes result from these errors.

JoAnn's first argument concerns a $141,000 loan for Big Bart. The parties used the apartment complex they bought during the marriage to secure that loan. At the time of dissolution, they owed $95,525 on the loan. The court awarded JoAnn the apartment complex, which it assigned a net value of $297,656.[8] JoAnn argues the court failed to include the $95,525 debt in that valuation.

---

marital property but later amended the decree to remove the rental real estate from the property distribution.

[8] The fair market value of the apartment complex was $425,000. The property was encumbered by a $120,937 mortgage for an equity value of $304,063. From this amount, the court added $664 of personal property associated with the complex. It then subtracted the accrued property tax and income tax preparation costs of $7071 to arrive at the net value of $297,656. Subtracting the $95,525 debt secured by the property results in a net value of $202,131.

In amending the decree, the court acknowledge that it erroneously deducted the outstanding loan from the valuation of Big Bart equipment, which it awarded Troy. The court stated it intended to allocate the debt to JoAnn because she was awarded the apartment complex that secured the loan. The court adjusted the value of Big Bart by adding back the $95,525 it erroneously deducted in the original decree, but it failed to reflect that debt in JoAnn's property distribution by deducting that amount from her net assets. We modify the decree to deduct $95,525 from the total value of JoAnn's share of the marital property.

JoAnn's second argument concerns a deduction from the value of Big Bart equipment that the district court added when it amended the decree. As stated above, the court amended the decree to eliminate a $95,528 loan secured by the apartment complex. But the court subtracted $148,403 of debt[9] from the $147,667 value of its tractors and trailers, resulting in a negative net value of $738. JoAnn argues that $98,824 of this debt should not be deducted because it was credit card debt that Troy incurred during the dissolution proceedings. Under paragraph eight of the premarital agreement, "any credit cards incurred by either party during a separation shall be the responsibility of the party incurring the debt." JoAnn agrees the court correctly assigned the debt to Troy but argues it is not marital and should not be included to lower the total value of property Troy received in the property distribution. We agree and modify the decree to increase the total value of Troy's share of the marital property by $98,824.

---

[9] In his rule 1.904 motion, Troy characterized this debt as "liens" against the equipment.

**C. Conclusion.**

We affirm the dissolution decree but modify the amended decree to correct the valuation errors set out above. After modifying those values, Troy's share of the marital property is $1,103,593.50 and JoAnn's share of the marital property is $891,161.50. The value of the marital property awarded to Troy is $212,432 more than the value of the property awarded to JoAnn. JoAnn asks that we balance the inequity by ordering Troy make an equalization payment equal to one-half the difference in the value of the distributed property, which is $106,216. But as stated, we are required to make an equitable distribution of property, not an equal one. In doing so, we may consider the property each party brought into the marriage and economic circumstances of the parties. *See* Iowa Code § 598.21(5)(a), (i). Under the modified values of the property division, Troy receives around 55% of the marital property while JoAnn receives about 45%.[10] But because JoAnn's overall assets are significantly greater than Troy's, we find the division of marital property is equitable and decline to order any equalization payment.

**AFFIRMED AS MODIFIED.**

---

[10] The total value of the marital property awarded to each party does not include Troy's pension, which the district court distributed under the percentage method set out in *In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996) (describing the formula for determining what percentage of the payable benefit a spouse will receive when a pension matures rather than a present-value method). Factoring in JoAnn's share of Troy's pension would decrease the difference in the percentage of marital property awarded to each party.