# IN THE COURT OF APPEALS OF IOWA

No. 17-0940
Filed October 24, 2018


**IN RE THE MARRIAGE OF ASHLEY DAWN HOLTKAMP
AND NATHAN WADE HOLTKAMP**

**Upon the Petition of
ASHLEY DAWN HOLTKAMP,**
        Petitioner-Appellant,

**And Concerning
NATHAN WADE HOLTKAMP,**
        Respondent-Appellee.

_____


        Appeal from the Iowa District Court for Des Moines County, John G. Linn,

Judge.


        Ashley Holtkamp appeals from the decree dissolving her marriage to

Nathan Holtkamp.  **AFFIRMED AS MODIFIED**


        Marlis J. Robberts of Robberts & Kirkmann, LLLP, Burlington, for appellant.

        Michael D. Clark of Clark & Schroeder, PLC, North Liberty, for appellee.


        Heard by Vogel, P.J., and Vaitheswaran and McDonald, JJ.

**VOGEL, Presiding Judge.**

Ashley Holtkamp appeals from the decree dissolving her marriage to Nathan Holtkamp.  She argues the trial court erred in finding their prenuptial agreement enforceable and in establishing Nathan's visitation schedule with the parties' minor children.  Because Ashley failed to prove the prenuptial agreement was executed involuntarily, was procedurally unconscionable, or lacked a financial disclosure, we agree with the district court that the prenuptial agreement is enforceable.  Additionally, we modify the visitation schedule on Tuesday nights and weekends and otherwise agree the visitation schedule is in the best interests of the children.  Therefore, we affirm the decree as modified.

## I.    Background Facts and Proceedings

Nathan and Ashley Holtkamp married on May 13, 2006.  The marriage produced two children, born in September 2006 and December 2007.

Nathan was born in November 1968.  He graduated from high school in 1987, and he began building his highly successful trailer repair business while still in high school.  At the time of trial, he had owned and operated Holtkamp Trailer Repair as a sole proprietorship for approximately thirty years.  According to his May 9, 2006, Personal Financial Statement, he had a total annual income of $600,000 and Holtkamp Trailer Repair had a present net value of $2,750,000. According to his tax returns, he reported gross receipts of $574,969 in tax year 2006, which grew to $1,325,013 in tax year 2015.[1]  He has previously divorced

---

[1] The district court noted the difficulty in calculating Nathan's true disposable income, stating he only reported a net profit of $3450 in tax year 2015 due to significant reductions from cost of goods, depreciation, and other expenses.  He maintains a single checking account for his personal and business finances, despite advice from his tax preparer,

twice after marriages of five years each, and he was previously engaged to two other women without marrying either.

Ashley was born in July 1981. She graduated from high school in 2000 and became a licensed cosmetologist in 2001. She worked as a cosmetologist and as a paraeducator in the local school before and after the marriage. The district court noted her income in 2016 was $7437.

One of the issues on appeal is the enforceability of a prenuptial agreement, which both parties signed on May 11, 2006, two days before the wedding. Among its provisions, the agreement states both parties shall retain separate ownership of the property and liabilities they separately acquired both before and during the marriage. The agreement also states that, in the event of dissolution, each party shall have no interest in the other's separate property. The separately-owned property acquired prior to marriage specifically includes the personal property listed in Nathan's attachment titled "Personal Financial Statement." Additionally, the agreement states each party "has received full and complete answers to all questions the other has asked about the other's income and assets," and "each has carefully considered their right to be represented by separate attorneys."

The parties offered differing testimony about the events preceding the signing of the prenuptial agreement. According to Ashley's testimony, she met Nathan around May 2005, they began dating in August 2005, and a couple months

---

which creates challenges in sorting personal and business expenses. Suspecting improper deductions and unreported income, Ashley believed his true annual income was close to $200,000. The district court estimated his true annual earning capacity was $80,000 to $140,000, and it imputed an annual earning capacity of $100,000 for calculating his child support obligation.

later she moved from her parents' home into Nathan's home. They became a serious couple in November 2005 when he gave her a ring, and they had set their wedding date by Christmas 2005. She learned she was pregnant with their first child in mid-January 2006. Also in January 2006, she began planning for their "very small wedding" with about fifty guests at their home. She first learned he wanted her to sign a prenuptial agreement on the morning of May 11. However, she claimed Nathan simply told her she "needed to sign something because he was going to get sued and" the document would protect them. Later that afternoon, she met him at the office of attorney Bryan Schulte, who had drafted the agreement for Nathan. She was inside the office for about fifteen minutes, during which time she met with Nathan and Schulte, they read through the agreement, and she signed it. She claimed no one told her she should consult another lawyer before signing; she did not know what a prenuptial agreement was, she did not understand the importance of the document, and she never received a copy of the document until these divorce proceedings.

Nathan presented a very different account of the events leading up the signing of the prenuptial agreement. He testified he bought Ashley's engagement ring in early November 2005; however, she did not begin wearing the ring until Christmas 2005. They became engaged around Christmas 2005, but they did not discuss marriage at the time. To him, "engaged" means "[t]hat possibly you would get married, that you're a couple." They only began discussing marriage after they learned she was pregnant in January 2006. Ashley and her parents then began pressuring him to marry her before she gave birth to their child. In late March or early April 2006, he told her he would marry her but only if she signed a prenuptial

agreement. He denied telling her the agreement was meant to protect them from a lawsuit. From his standpoint, Ashley indicated she understood the agreement and told him "she didn't want anything of mine, business and/or anything like that, that she wasn't that type of person; she knew she was coming into the marriage with nothing." He recalled Schulte gave her a chance to read the agreement, offered to let her take it to another attorney, and offered to give her a copy. She declined the offers of consulting another attorney or receiving a copy, and "she scanned through some of it" and signed it.

Fast forward to September 15, 2015, when Ashley filed the petition for dissolution of marriage. The prenuptial agreement made its appearance during the discovery phase of these proceedings and became a primary issue during trial and now on appeal. Trial was held on January 10, 11, and 12, 2017. On April 12, the court issued the decree of dissolution, which decided the prenuptial agreement was enforceable, granted physical care of the children to Ashley, and entered a schedule for the children to visit Nathan overnight on Tuesdays and alternating weeks in the summer. Both parties then filed motions asking the court to reconsider or enlarge its decree, which the court subsequently denied on May 16. Ashley now appeals, arguing the court erred in finding the premarital agreement enforceable and in establishing the visitation schedule.

## II. Standard of Review

We review dissolution proceedings de novo. *In re Marriage of Shanks*, 758 N.W.2d 506, 510 (Iowa 2008). Our de novo review extends to "issues concerning the validity and construction of premarital agreements." *Id.* at 511. "We give

weight to fact findings of the district court, particularly as to witness credibility, but are not bound by them." *Id.*

### III.    Prenuptial Agreement

Iowa Code chapter 596 (2015) applies to prenuptial agreements executed on or after January 1, 1992. *Id.* In addition to the statute, we generally apply contract law in evaluating prenuptial agreements. *See id.* at 511–19. A prenuptial agreement is not unenforceable merely because it is "a bad fiscal bargain for one party." *In re Marriage of Spiegel*, 553 N.W.2d 309, 316 (Iowa 1996) ("[W]e will not so grossly interfere with the parties' freedom to contract."), *superseded by statute on other grounds as recognized by Shanks*, 758 N.W.2d at 512. A premarital agreement is unenforceable if a person involved proves any of the following:

> a. The person did not execute the agreement voluntarily.
> b. The agreement was unconscionable when it was executed.
> c. Before the execution of the agreement the person was not provided a fair and reasonable disclosure of the property or financial obligations of the other spouse; and the person did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other spouse.

Iowa Code § 596.8(1). Ashley argues the prenuptial agreement is unenforceable under all three paragraphs.

### A.  Voluntariness

A premarital agreement is unenforceable as involuntarily executed if one party proves duress or undue influence. *Shanks*, 758 N.W.2d at 512–13. Duress occurs if "(1) one party issues a wrongful or unlawful threat and (2) the other party had no reasonable alternative to entering the contract." *Id.* Ashley does not point to a specific threat Nathan made, and his statement that he would not marry her without a prenuptial agreement is not a wrongful or unlawful threat. *See id.* In

addition, Ashley had the option of cancelling the wedding. While she testified she had been planning for their May wedding since January, she also acknowledged it was a "very small wedding" in their home, and cancellation is generally a reasonable alternative to signing a prenuptial agreement. *See id.*; *see also Spiegel*, 553 N.W.2d at 318 ("[W]e do not think social embarrassment from the cancellation of wedding plans, even on the eve of the wedding, renders that choice unreasonable."). Therefore, Ashley has not shown duress.

> Undue influence is influence that deprives one person of his or her freedom of choice and substitutes the will of another in its place. Mere importunity that does not go to the extent of controlling the will of the grantor does not establish undue influence. Freedom from undue influence is presumed.

*Shanks*, 758 N.W.2d at 513 (internal quotation and quotation marks omitted). Ashley points to the lateness of the agreement, her being five-months pregnant, the lack of explanation provided to her, and problems with the financial disclosures as proof of undue influence. None of these issues show Nathan controlled her will to the extent he unduly influenced her to sign the agreement. *See id.* ("The facts presented here simply do not demonstrate the improper or wrongful constraint, machination, or urgency of persuasion required for a finding of undue influence." (internal quotation and quotation marks omitted)). Therefore, Ashley has not shown she executed the prenuptial agreement involuntarily. *See* Iowa Code § 596.8(1)(a).

## B. Unconscionability

Unconscionability may be procedural or substantive. *Shanks*, 758 N.W.2d at 515. Ashley only claims the prenuptial agreement was procedurally unconscionable. "Procedural unconscionability generally involves employment of

'sharp practices[,] the use of fine print and convoluted language,' as well as 'a lack of understanding and an inequality of bargaining power.'" *Id.* (quoting *Rite Color Chem. Co. v. Velvet Textile Co.*, 411 S.E.2d 645, 648 (N.C. Ct. App. 1992)). "[T]he primary focus of the procedural unconscionability inquiry is the advantaged party's exploitation of the disadvantaged party's lack of understanding or unequal bargaining power." *Id.* at 517. Our supreme court has provided the following factors for identifying procedural unconscionability:

> the disadvantaged party's opportunity to seek independent counsel, the relative sophistication of the parties in legal and financial matters, the temporal proximity between the introduction of the premarital agreement and the wedding date, the use of highly technical or confusing language or fine print, and the use of fraudulent or deceptive practices to procure the disadvantaged party's assent to the agreement.

*Id.* (citations omitted).

The district court found the factor weighing most heavily for unconscionability here is the temporal proximity of two days between introduction of the prenuptial agreement and the wedding.[2] *See id.* Even if we accept Nathan's testimony that he generally discussed an agreement with Ashley as much as six weeks before the wedding, she could not consider a specific agreement—or even know if he still demanded an agreement—until two days before the wedding.

Relatedly, the short temporal proximity also limited Ashley's opportunity to seek independent counsel. *See id.* Nathan first presented the prenuptial

---

[2] As was discussed during oral argument, Iowa Code section 596.8 does not provide a minimum amount of time for a prenuptial agreement to be presented before the wedding. While such a bright-line rule could negate temporal attacks as procedurally unconscionable, we believe the legislature is best equipped to decide whether and where to draw that line.

agreement late in the afternoon of Thursday, May 11, 2006. As a result, Friday was essentially the only business day for her to locate and consult with independent counsel before the wedding on Saturday, May 13. However, she does not claim Nathan or anyone else discouraged her from seeking independent counsel; she merely claims no one discussed an independent counsel with her. Regardless of whether anyone verbally discussed an independent counsel with her, the prenuptial agreement she signed specifically mentions the parties' "right to be represented by separate attorneys," and she testified she had an opportunity to ask questions of Schulte.[3]

Nathan was undoubtedly more sophisticated in financial and legal matters than Ashley. *See id.* At the time of marriage, he was thirty-seven years old, he had operated his successful business for about twenty years prior to the marriage, and he had navigated marriage and divorce twice before in addition to two other engagements. By contrast, she was twenty-four years old with no sophistication in financial or legal matters. While she lacked his previous experience in these matters, she is a high school graduate who completed postsecondary vocational training, and she testified her health is good and her intelligence is at least average.

The prenuptial agreement is a legal document; as such, some level of legal training or guidance is likely needed to fully understand it. However, it is not an excessively technical or confusing legal document. *See id.* The agreement spans three pages plus a notary page and Nathan's attached Personal Financial

---

[3] Schulte testified via an evidentiary deposition that Ashley "was very comfortable with the proceedings, and she appeared to understand what was going on and what she was signing, and never requested time to contact a lawyer or be represented in any manner."

Statement. The agreement contains nine provisions in ordinary typeface, each separately numbered with a bold summary title. The agreement announces its nature by being titled a "PRENUPTIAL AGREEMENT" in bold at the top of the first page.[4] While prenuptial agreements are legalistic, their general concept is not new or uncommon. *See*, *e.g.*, *Jacobs v. Jacobs*, 42 Iowa 600 (1876) (finding a prenuptial agreement enforceable).

Finally, Ashley testified Nathan deceived her about the nature of the prenuptial agreement. *See Shanks*, 758 N.W.2d at 517. This evidence is limited to her testimony that he told her the agreement would protect them from a lawsuit. Because the record contains no other evidence of deceit, we agree with the district court, Nathan did not intentionally misrepresent the agreement. Furthermore, any misunderstandings were mitigated by discussing and signing the agreement in the office of Schulte, who testified the signing was unremarkable and is professionally obligated to avoid engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c).

Taking the factors together, the two-day gap between introduction of the prenuptial agreement and the wedding is troubling. However, Ashley never testified the late introduction caused her to rush her decision to sign or created difficulty finding independent counsel to advise her. Instead, she argues she did not fully understand the agreement before signing. Despite her lack of

---

[4] Ashley questioned whether the agreement was titled "PRENUPTIAL AGREEMENT" when she signed it. However, she also testified she did not read the agreement carefully. The first full page of the prenuptial agreement bears the appropriate title, and the rest of the document would make no sense with that page not included. We agree with the district court that the agreement contained the title "PRENUPTIAL AGREEMENT" at the time of signing.

sophistication in legal and financial matters, her own testimony shows her capable of generally understanding the effect of a prenuptial agreement, even if she did not fully understand all implications of this specific agreement. Nathan did not intentionally cause her to misunderstand the agreement, the plain appearance of the agreement revealed itself to be a prenuptial agreement, and she had opportunities to clarify her misunderstandings from Schulte or an independent counsel. Furthermore, she never testified that she would have acted differently even with additional time and perfect understanding prior to signing. Therefore, we find the prenuptial agreement was not procedurally unconscionable.

### C. Financial Disclosure

A prenuptial agreement is unenforceable if one "person was not provided a fair and reasonable disclosure of the property or financial obligations of the other spouse." Iowa Code § 596.8(1)(c). The record contains Nathan's "Personal Financial Statement" as an attachment to the agreement. This statement provides values for his personal property, including a specific valuation for Holtkamp Trailer Repair of $2,750,000. Ashley complains the financial disclosure was not attached to the prenuptial agreement before signing. However, both Nathan and Schulte[5] asserted it was attached to the agreement, and the district court agreed. Moreover, the disclosure need only be "fair and reasonable." *Id.*; *see also Shanks*, 758 N.W.2d at 519 (stating the complaining spouse does not need complete "personal bank account and pension information" because section 596.8(1)(c) "does not impose such an exacting standard").

---

[5] Schulte testified the financial statement "was provided to Ashley because I provided each of the parties a copy of the agreement with that financial statement attached."

Even if we assume for the moment Nathan's financial statement was not attached, the prenuptial agreement is only unenforceable if Ashley also did not have "an adequate knowledge of the property or financial obligations of" Nathan. Iowa Code § 596.8(1)(c). She testified she knew he was "a very wealthy man" prior to marriage. She also testified she knew he owned all of the assets listed on the Personal Financial Statement except his firearms and jewelry collections valued at $125,000 total. While she claims she did not know the precise value of all of his assets, she had an adequate knowledge of his assets at the time of signing. Therefore, we agree with the district court  Nathan made the proper financial disclosure prior to the prenuptial agreement both because Ashley was "provided a fair and reasonable disclosure" of his property and obligations and because she had "an adequate knowledge of" his property and obligations. *See id.*

### D. Conclusion

Ashley has not shown she executed the prenuptial agreement involuntarily, the agreement was procedurally unconscionable, or Nathan failed to provide a proper financial disclosure. *See id.* § 596.8(1). Therefore, the parties' prenuptial agreement is enforceable.

### IV.    Visitation

Ashley also appeals the visitation schedule in the decree. On October 19, 2015, the district court entered a temporary order placing physical care with her and granting visitation with Nathan on Tuesdays from the end of school until 8:00 p.m. and alternating weekends from the end of school on Friday until 7:00 p.m. Sunday. In the April 12, 2017 decree, the court entered additional visitation

provisions—including a summer visitation provision—and extended visitation with Nathan on Tuesdays until 8:00 a.m. the next morning and on alternating weekends until 8:00 a.m. Monday. In the May 16 ruling on post-trial motions, the court specifically denied Ashley's request for a right of first refusal for caring the children when the other parent is unavailable. Ashley asks us to restore the Tuesday and weekend visitation schedule from the temporary order and to grant a right of first refusal during the summer.

In a dissolution action involving children, the Iowa Code states:

The court, insofar as is reasonable and in the best interest of the child[ren], shall order the custody award, including liberal visitation rights where appropriate, which will assure the child[ren] the opportunity for the maximum continuing physical and emotional contact with both parents after the parents have separated or dissolved the marriage, and which will encourage parents to share the rights and responsibilities of raising the child[ren] unless direct physical harm or significant emotional harm to the child[ren], other children, or a parent is likely to result from such contact with one parent.

Iowa Code § 598.41(1)(a). "[S]tability and continuity of caregiving are important factors that must be considered in custody and care decisions." *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007).

Regarding visitation, Ashley points to her role as the children's primary caretaker during the marriage. The court agreed with her characterization, noting in the decree, "[i]n some respects, she might be considered the children's sole caretaker based on Nathan's overriding commitment to his business operation." The court praised her for providing for the children's material and financial needs, providing for their emotional development, and encouraging their participation in extracurricular activities and church. The temporary order largely continued the

parties' marital arrangement, placing the children in Ashley's care the majority of time and granting visitation with Nathan on Tuesday evenings and weekends. On our review of the record, we find the Tuesday and weekend visitation schedule in the temporary order provides continuity and stability in the best interests of the children. Therefore, we modify the Tuesday visitation provision in the decree to allow Nathan to visit with the children every Tuesday from the time they are out of school until 8:00 p.m. We also modify the weekend visitation provision in the decree to allow Nathan to visit with the children every other weekend from Friday at the time they are finished with school until 7:00 p.m. the following Sunday.[6]

Regarding the right of first refusal, the district court found such a provision unnecessary and instructed the parties "to implement their own agreed upon provision for first option to care for the children." On our review of the record, we agree with the district court that a right of first refusal is unnecessary. Therefore, we deny Ashley's request to add a right of first refusal.

## V.    Conclusion

We agree with the district court that the prenuptial agreement is enforceable. We modify the decree regarding Tuesday visitation to allow Nathan to visit with the children every Tuesday from the time they are out of school until 8:00 p.m. We also modify the decree regarding weekend visitation to allow Nathan to visit with the children every other weekend from Friday at the time they are out of school until 7:00 p.m. the following Sunday. We otherwise agree the visitation

---

[6] We do not modify other visitation provisions in the decree.

schedule is in the best interests of the children.  Therefore, we affirm the decree of dissolution as modified.

**AFFIRMED AS MODIFIED**.