# IN THE COURT OF APPEALS OF IOWA

No. 18-0753
Filed March 6, 2019

IN THE MATTER OF THE ESTATE OF JOHN R. RHOTEN,
Deceased,

KATHRYN RHOTEN,
        Plaintiff-Appellant,

vs.

ESTATE OF JOHN R. RHOTEN, CO-EXECUTORS JOHN E. RHOTEN, JULIE
A. NELSON, JOAN K. BOND, and JAY R. RHOTEN,
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Dallas County, Richard B. Clogg,

Judge.


        A widow appeals the district court decision denying her challenge to the

validity of a premarital agreement filed in the probate proceedings for her late

husband. **AFFIRMED.**


        R. Bradley Skinner and Cameron K. Wright of Skinner Law Office, PC,

Altoona, for appellant.

        Tyler Smith of Smith Law Firm, PLC, Altoona, for appellees.


        Heard by Potterfield, P.J., and Tabor and McDonald, JJ.

**McDONALD, Judge.**

Kathryn Rhoten appeals the district court decision denying her challenge to the validity of a premarital agreement filed in the probate proceedings for her late husband, John Rhoten. We find Kathryn has not shown the premarital agreement is unenforceable on the ground John failed to disclose all of his assets and debts to her and further find the premarital agreement is not unconscionable. We affirm the district court.

## I.      Background Facts & Proceedings

John had a farm near Linden, in Dallas County. From his first marriage, John had five children, John E. Rhoten (John E.), Julie Nelson, Jeannie Rhoten,[1] Joanie Bond, and Jay Rhoten. John consistently told his children he wanted his farmland to go to them when he died.

In 1992, John met Kathryn, who was living in Des Moines. Kathryn had two previous marriages, which had ended in divorce. She had a successful career in the insurance industry, working for several large companies and receiving promotions and advancements. In 1994, Kathryn moved to the farm to live with John. She worked out of an office in the home. John usually conducted his business dealings concerning the operation of the farm while sitting at the kitchen table, and Kathryn was present during some of John's business conversations.

In November 1997, John and Kathryn became engaged. John discussed a premarital agreement with his attorney, Samuel Braland. Also, John and Kathryn had discussed a premarital agreement. On August 24, 1998, Braland sent a

---

[1]  Jeannie predeceased John, her father.

premarital agreement to John. The agreement stated a net worth statement was attached, but no statement was attached to the premarital agreement Braland sent to John. The premarital agreement provided:

> In consideration of their marriage and this agreement, if John dies testate Kathryn hereby waives, relinquishes, releases and renounces the right of election to take against John's will provided under Section 633.238 Code of Iowa (1997) . . . . It is understood and agreed that Kathryn shall have and take only what is devised to her in John's Will, if anything, and she shall have no other right, title, interest or allowance in or from his testate estate.

The agreement included a corresponding provision, stating John would acquire no right in Kathryn's testate estate.

John and Kathryn set a wedding date for Saturday, November 28, 1998. In the evening on Monday, November 23, John asked his daughter Julie, who was a notary public, to come over to notarize a document. John signed the premarital agreement in Julie's presence, and she notarized it. John told Julie to take the premarital agreement to Kathryn for her signature. Julie, who was employed by Kathryn as an administrative assistant, gave the premarital agreement to Kathryn, who was in her home office. Kathryn had not previously seen the document, however, she stated she was not surprised to receive the premarital agreement. She read the document and signed it. She brought the signed premarital agreement to John. At the time, Kathryn was earning about $150,000 per year, while John's farming operation was losing about $33,000 per year.

On Tuesday, November 24, Kathryn finalized a large project for work. On Wednesday, November 25, John and Kathryn went to get a marriage license, then had a Thanksgiving meal with John's children. On Thursday, November 26, Thanksgiving Day, John and Kathryn first spent time with John's mother and then

with Kathryn's mother. On Friday, November 27, Kathryn stated she spent the day making food for John's bachelor party that evening. On Saturday, November 28, John and Kathryn were married. They left on a ten-day honeymoon from the wedding reception.

John died on September 10, 2016. At the time he died the value of his estate was estimated to be $4,577,412, the majority of which was held in land, buildings, machinery, and livestock. A probate estate was opened. John also had created the John R. Rhoten Revocable Trust Agreement. Under John's will, his assets went to the trust. The court found, "The property will be held as an asset of the John R. Rhoten Trust and will pass to the beneficiaries of the trust."[2]

On February 16, 2017, Kathryn filed a petition for declaratory judgment, seeking a determination of the validity of the premarital agreement. Kathryn testified she did not understand the premarital agreement at the time she signed it. She stated no one explained the agreement to her or told her she could seek the advice of an attorney. Kathryn also stated she did not have time to consult with an attorney between when the premarital agreement was presented to her on the evening of November 23 and when she got married on November 28. She stated if she understood the provisions she would not have objected but would have talked the matter over with John.

---

[2] The parties did not appeal this finding in the district court's decision. Under the terms of the trust, Kathryn receives "all livestock and machinery belonging to the trust or to the trustor on the date of the trustor's death." She was also to receive the residue "[a]fter distribution of the trustor's real estate, crops, machinery, and livestock." John's will contained similar provisions.

The district court determined the premarital agreement was enforceable. The court found Kathryn was familiar with John's farming assets because she lived with him for four years before they got married and because John openly conducted his farming business in the home. The court also found the premarital agreement was not unconscionable. The court concluded under the terms of the premarital agreement, Kathryn was precluded from making a spousal election against John's assets, whether they were held by the probate estate or the trust. Kathryn appealed the district court's decision.

## II. Financial Disclosure

Kathryn claims the premarital agreement is unenforceable because she was not provided a fair and reasonable disclosure of John's assets and liabilities. She points out the premarital agreement provided, "A net worth statement of each party is attached to this agreement," but no such statement was attached. Braland testified a net worth statement was not attached to the premarital agreement he sent to John. Also, Julie testified she did not see a net worth statement when she observed John sign the premarital agreement or when she gave the document to Kathryn. Furthermore, Kathryn claims she did not have adequate knowledge of John's property.

Premarital agreements in Iowa are subject to the Iowa Uniform Premarital Agreements Act, chapter 596. *In re Marriage of Erpelding*, 917 N.W.2d 235, 238 (Iowa 2018). In general, premarital agreements "are favored in the law and should be construed liberally to carry out the intention of the parties." *In re Marriage of Van Brocklin,* 468 N.W.2d 40, 45 (Iowa Ct. App.1991). Premarital agreements are construed, considered, and treated in the same manner as ordinary contracts. *Id.*

"[I]ssues concerning the validity and construction of premarital agreements are equitable matters subject to our de novo review." *In re Marriage of Shanks*, 758 N.W.2d 506, 511 (Iowa 2008).

Iowa Code section 596.8(1)(c) provides a premarital agreement is not enforceable if:

> Before the execution of the agreement the person was not provided a fair and reasonable disclosure of the property or financial obligations of the other spouse; and the person did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other spouse.

The section "requires only 'fair and reasonable' disclosure, or that the party could have had 'adequate knowledge' of the other party's property and financial obligations." *Shanks*, 758 N.W.2d at 519. "We have never required that a party have precise valuations of the other's assets; a general knowledge of the true nature and extent of the other's properties is sufficient." *In re Marriage of Spiegel*, 553 N.W.2d 309, 317 (Iowa 1996) (superseded by statute on other grounds as recognized by *Shanks,* 758 N.W.2d at 510–11). Section 596.8 does not impose an exacting standard. *Shanks*, 758 N.W.2d at 519.

In the case, *In re Estate of Ascherl*, 445 N.W.2d 391, 393 (Iowa Ct. App. 1989), we found a wife had adequate knowledge of her husband's property, stating:

> Anna and Thomas dated for over a year, and Anna visited Thomas's farm several times prior to their marriage. As the trial court noted, "she had the opportunity to view the extent of the machinery, the condition of the farm, and the circumstances surrounding its cropping." From this, we think it fair to infer that Anna was in a position to know something of Thomas's property. Furthermore, we think it also important to note that Anna has been involved in various businesses throughout the years and was not unaware of the importance or effect of binding legal documents. We also note, as

the trial court did, that Anna had been married before and had gone through a dissolution and successfully retained a fair share of the marital property.

(Citation omitted); *see also Fisher v. Koontz*, 80 N.W. 551, 551 (Iowa 1899) ("The evidence very satisfactorily establishes her knowledge of the extent of decedent's property before their marriage. She had visited his farms with [him], and walked over them with him."); *In re Marriage of Crawford*, No. 04-0770, 2004 WL 2805269, at *3 (Iowa Ct. App. Dec. 8, 2004) ("Joyce had a general knowledge of the nature and extent of Ralph's properties as the parties cohabitated prior to marriage.").

When questioned about the time period when she lived on the farm before the marriage, Kathryn testified she took picnics out to John and rode with him in the fields. She knew how many hired men he had working on the farm. Kathryn knew the farm buildings, such as the chicken house, machine shed, and grain bins, and was aware of their purposes. She was also aware of the machinery John owned to run the farming operation. Additionally, Kathryn's testimony shows she knew the machinery kept in each of the buildings.

The district court found:

> Before marrying John R., Kathryn became familiar with John R.'s farm and his farming operation. At hearing and in deposition, Kathryn testified to detailed knowledge of John R.'s farm, farm buildings, equipment, and farming operations. She was familiar with the various buildings on John R.'s farm and their specific uses and items kept there. John R. never concealed any of his farming assets from her. Kathryn also had knowledge of some of the financial particulars of the farming operation, including her contribution in turning the profitability of the farm operations around before and after marrying John R.

On our de novo review, we agree with the district court's conclusion the evidence shows Kathryn had adequate knowledge of John's property and financial

obligations. At the time the parties married, Kathryn had been living on the farm for four years, and had been dating John for two years before that. John did not have any hidden assets—his assets were primarily land, buildings, machinery, and livestock, which were readily visible. Additionally, the evidence showed John conducted his farm business while sitting at the kitchen table in the home he and Kathryn shared and Kathryn was present during some of John's business conversations. Furthermore, Kathryn's testimony shows she was aware of John's assets. We conclude the premarital agreement is not invalid under section 596.8(1)(c).

### III.     Unconscionability

Kathryn claims the premarital agreement is not enforceable because it was procedurally unconscionable when it was executed. She states she did not have sufficient time to consider the agreement or an adequate opportunity to seek the advice of counsel. Kathryn notes no one suggested she had the right to seek independent counsel. She states she did not fully understand the premarital agreement.

A premarital agreement is not enforceable if "[t]he agreement was unconscionable when it was executed." Iowa Code § 596.8(1)(b). The Iowa Supreme Court has not adopted a precise definition of "unconscionability," but has stated "the concept is not a means by which a party may escape the requirements of an unfavorable contract after experiencing buyer's remorse." *Shanks*, 758 N.W.2d at 515–16. "[A]bsent an unconscionable bargaining process, a court should be hesitant to impose its own after-the-fact morality judgment on the terms of a voluntarily executed premarital agreement." *Id.* at 516. An action to revoke

or enforce a premarital agreement on the issue of unconscionability is "decided as a matter of law." Iowa Code § 596.9; *cf. Shanks*, 758 N.W.2d at 511 n.4 (finding the language of section 596.9 "does not alter the trial court's traditional role or our scope of review" in equitable proceedings).

In considering procedural unconscionability, we look at the following factors: (1) the disadvantaged party's opportunity to seek independent counsel; (2) the relative sophistication of the parties in legal and financial matters; (3) the temporal proximity between the introduction of the premarital agreement and the wedding date; (4) the use of highly technical or confusing language or fine print; and (5) the use of fraudulent or deceptive practices to procure the disadvantaged party's assent to the agreement. *Shanks*, 758 N.W.2d at 517 (citations omitted).

Kathryn had the opportunity to seek independent counsel during the four and one-half days between when she received the premarital agreement on Monday evening to when she got married on Saturday. We note Kathryn was represented by counsel in her previous divorces, and an attorney had helped her in a real estate matter. Moreover, her father was an attorney. The evidence shows Kathryn had obtained the services of an attorney in the past when she believed she needed legal assistance.

Kathryn also had ample time to thoroughly read the document before she signed it; there was no evidence John or Julie told her she had to sign immediately after receiving it. Kathryn was a successful businesswoman. Furthermore, Kathryn and John had discussed a premarital agreement, so Kathryn was not surprised when she was given the agreement a few days before the wedding. There was no evidence John was more sophisticated than Kathryn in legal and

financial matters. We do not find the language of the premarital agreement to be "highly technical or confusing." *See id.* Also, there was no evidence of fraudulent or deceptive practices.

The district court found, "Kathryn has not offered evidence that the Agreement was unconscionable. There is no evidence of fraudulent or deceptive practices in obtaining Kathryn's signature to the Premarital Agreement." We find no error in and also concur with the district court's conclusion.

We affirm the district court's decision denying Kathryn's action seeking to have the premarital agreement declared to be unenforceable.

**AFFIRMED.**