# IN THE COURT OF APPEALS OF IOWA

No. 22-1963
Filed June 5, 2024

IN RE THE MARRIAGE OF ELLEN M. SANDERS
AND WILLIAM G. SANDERS

Upon the Petition of
ELLEN M. SANDERS, n/k/a ELLEN M. NOLTE,
    Petitioner-Appellee,

And Concerning
WILLIAM G. SANDERS,
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Sarah Crane (ruling on enforceability of premarital agreement) and Jeanie Vaudt (dissolution decree), Judges.

A husband appeals the decree dissolving his marriage, challenging the ruling on the enforceability of a premarital agreement, division of the marital estate, and attorney-fee award. **AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS.**

William W. Graham of Duncan Green, P.C., Des Moines, for appellant (until withdrawal), and William G. Sanders, Bradenton, Florida, self-represented appellant.

Christopher B. Coppola and Jennifer H. De Kock of Coppola Carroll Hockenberg, P.C., West Des Moines, for appellee.

Considered by Tabor, P.J., and Badding and Buller, JJ.

**BADDING, Judge.**

After three years in court, and hundreds of thousands of dollars in attorney fees, Ellen and William Sanders were divorced. In a bifurcated proceeding, the district court concluded the parties' premarital agreement was unenforceable and then resolved most of the financial disputes against William, finding "[s]upport for much of what he asserts is nonexistent."

William appeals, trying to rewrite the court's adverse credibility findings. He claims the court erred in (1) finding the premarital agreement was not enforceable, (2) treating his inherited assets as marital property, (3) requiring him to be partially responsible for debt under a home equity line of credit, (4) conditioning the duration of his obligation to pay Ellen's health insurance expenses on whether he appealed, and (5) awarding Ellen trial attorney fees.

## I.     Standard of Review

We review William's claims de novo. *See In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021); *In re Marriage of Shanks*, 758 N.W.2d 506, 510–511 (Iowa 2008). "While we give weight to the findings of the district court, particularly about the credibility of witnesses, we are not bound by them." *In re Marriage of Towne*, 966 N.W.2d 668, 674 (Iowa Ct. App. 2021). The district court's property distribution "will be disturbed only when the ruling fails to do equity." *Id.*

## II.     Analysis

### 1.     Premarital Agreement

William and Ellen met in October 2007. A couple of months later, William bought a home in Urbandale. He lived with Ellen at the home she owned in West Des Moines while he remodeled the Urbandale house. The couple got engaged

in December 2008.  Ellen sold her home the next year, around September 2009, and moved in with William.  She was working in the insurance industry at the time, and William was retired.  They were married on January 30, 2010—the same day their premarital agreement was signed.  Ellen petitioned for divorce in May 2019.  The trial on the enforceability of the premarital agreement was held in January 2021, followed by the trial on the division of assets and debts in November.  Ellen was sixty-two years old by then, and William was sixty-eight.

At the first phase of the trial, William testified that he brought up a premarital agreement with Ellen "very early on after" they met because, he explained, "I was almost 60 years old and I've already made my living.  I've got a lot of assets I want to protect, and she didn't have a problem with that."  According to William, and his exhibit BB, he and Ellen began working from a rough draft of an agreement in January 2009 and revised it eighteen times to reach the "final official version" that was signed on their wedding day.  William said that he saved, dated, and initialed each revision.  But his documentation was sketchy.  For example, Ellen bought a Cadillac in October 2009 with some of the proceeds from the sale of her house.  Yet the revisions included in William's exhibit BB list the Cadillac multiple times before it was even purchased—as far back as March 2009.  When asked how these discrepancies were possible, William said, "I don't know."  Ellen testified that the first time she saw the documents included in exhibit BB was the week before trial.  She was in shock as she looked through them because "this didn't happen."  Ellen suspected that William, whether by himself or with someone else's help, "made this up to support that we had talked about it for a long time."

William also offered emails between him and Ellen that he said showed them discussing the premarital agreement on January 21, 2010, nine days before their wedding. In an email that William supposedly sent Ellen, he stated:

> I have attached the premarital agreement. I have not attached attachment A or B. A is my assets. B is your assets.
> For now we need to take the house off the table. I could not find the paper copy you had last night so I do not know if you had any changes.

Even though the email didn't show that anything was attached, Ellen's email in response said: "I have the copy of pre-nup. We can discuss." Ellen testified that she did not remember this email exchange. Though she did not deny that it could have happened, Ellen testified William had once told her that he knew how to forge emails and make them look real.[1]

According to Ellen, the first time William mentioned a premarital agreement was a week to ten days before their wedding. She explained that one night after dinner, William "pulled out his laptop and he started reading stuff off of his laptop regarding a prenup." Ellen said they argued about it, and she refused to sign one, telling him, "let's call off the wedding, we don't have enough time for this." Then Ellen went to her bedroom and called her longtime friend, Janet Schoon, about the argument. Schoon confirmed this conversation, testifying that Ellen was very upset by William's request and told him, "no, she did not want to do that and that she would not marry him." A day or two later, Ellen said that William told her to "forget about this and get married," so long as they kept their assets separate.

---

[1] William forging documents was not a new thing. He essentially admitted at trial that he forged a title to his son's truck after his son passed away in 2015.

After they made up, Ellen thought the premarital agreement was off the table. But then, just before the wedding ceremony at their home in Urbandale, William walked into their bedroom as she was putting her lipstick on and said, "you're going to sign it or we're not getting married." Ellen testified that was the first time she saw the full agreement. She was "devastated" and "felt like [she'd] been kicked in the gut." With her children and friends arriving for the wedding, Ellen signed the agreement without reviewing it, testifying that she would have been embarrassed and humiliated had she called the wedding off then. Schoon testified that Ellen seemed sad and preoccupied during the ceremony, like "something was bothering her." They spoke after, and Ellen told Schoon that William "had approached her with papers just prior to the ceremony and asked her to sign it and that she had."

The agreement provided that the parties would have "absolute control and disposition" of premarital assets, future inheritances, income and proceeds from either, and any property acquired with such income or proceeds. Incorporated into the agreement were exhibits A and B, which covered each party's individual property. The first two pages of exhibit A discussed the Urbandale home and Ellen buying a one-half interest in it from William for an initial payment of $65,000.00, followed by monthly payments of $600.00, "until a balance of $50,000 has been paid with interest @ 3% per annum."[2] The rest of exhibit A detailed William's

---

[2] The parties also signed a promissory note the day of the wedding, with William as the lender and Ellen as the borrower, in which Ellen agreed to pay the $50,000.00 under the terms specified in the premarital agreement. In his brief heading for the argument on the premarital agreement, William also contends the district court erred "by failing to require Ellen to pay her obligations under the

assets and debts, while exhibit B covered some of Ellen's assets and debts. None of the items listed for either party were valued. Ellen testified, "I knew nothing of value then [for William]. I know nothing now."

Ellen paid William $65,000.00 in February 2010—the rest of the proceeds from the sale of her home in West Des Moines after her Cadillac purchase. William argued at trial that because Ellen followed that part of the premarital agreement, she voluntarily signed it. But Ellen testified that before she sold her home, it was always the plan that she would pay William $65,000.00 to become an equal owner of his home—without reference to the premarital agreement. She argued the agreement was unenforceable as being involuntary, unconscionable, and not preceded by a full and reasonable disclosure. The district court agreed with Ellen on some of these points.

In its ruling on the validity of the premarital agreement, the court found William's claim of ongoing negotiations about the agreement to be lacking in credibility and Ellen's timeline more believable. While the court concluded that Ellen did not sign the agreement under duress and that it was not substantively unconscionable, the court found the agreement was procedurally unconscionable because Ellen's "ability to contact independent counsel was extremely limited since she learned William intended to pursue the premarital agreement only just before her wedding." The court also found "there was not a fair and reasonable disclosure of financial information" because no values were listed for the financial

---

promissory note she executed pursuant to th[e] agreement." Because William does not expand on this argument, we consider it waived. *See* Iowa R. App. P. 6.903(2)(a)(8)(3) (renumbered from rule 6.903(2)(g)(3)).

accounts in exhibits A and B. So the court found the agreement unenforceable due to procedural unconscionability and lack of fair and reasonable disclosure. *See* Iowa Code § 596.8(1)(b), (c) (2019); *Shanks*, 758 N.W.2d at 517–19.

William challenges these findings on appeal, but his arguments are largely based on his slanted version of events without reference to the court's credibility findings against him. On procedural unconscionability, William contends the emails between the parties show that Ellen had a copy of the agreement at least nine days before the wedding and they discussed it. *See Shanks*, 758 N.W.2d at 517 (considering the "disadvantaged party's opportunity to seek independent legal counsel" and the "temporal proximity between the introduction of the premarital agreement and the wedding date"). From there, William asserts Ellen's "disputed testimony" that the agreement was "off the table" was not credible. But adopting this argument would require us to ignore the clear credibility assessment from the district court judge, who had "a front-row seat to the live testimony, viewing the demeanor of both the witnesses as [they] testife[d] and the parties while they listen[ed]." *See Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) (noting in a de novo review that we do not "decide the case in a vacuum or approach it as though the trial court had never been involved"). This is not one of those "rare instances" in which that assessment should be disturbed. *See, e.g.*, *In re Marriage of Baker*, No. 14-1293, 2015 WL 4163351, at *3 (Iowa Ct. App. July 9, 2015).

The credible evidence accordingly shows that, while William may have proposed the agreement about a week before the wedding, he agreed that he would not pursue it after Ellen got upset. Thus, springing the agreement on Ellen the day of the wedding when she could not review it made her a disadvantaged

party with a lack of understanding and unequal bargaining power—an exploitation by William that warrants a finding of procedural unconscionability, as does her inability to obtain counsel. *See Shanks*, 758 N.W.2d at 517; *see also In re Marriage of Gutcher*, No. 17-0593, 2018 WL 5292082, at * 2 (Iowa Ct. App. Nov. 7, 2018) ("Given the short time between the presentation of the agreement and the wedding, it was not practical for her to obtain counsel. . . . Springing the prenuptial agreement on Nancy the day of the wedding is procedurally unconscionable.").

While William argues that Ellen testified "she didn't want to go to an attorney," he has taken that testimony out of context. Ellen was not testifying that she would not have gone to an attorney if she had time to do so. Indeed, on direct examination, she testified that when William first mentioned the agreement to her, she told him, "we don't have enough time for this." And she testified that more of her assets would have been listed on exhibit B if it had been presented to her earlier: "[W]e'd have gone to an attorney and I [would have] gotten an attorney's advice." With this context, we read the testimony that Wiliam highlights as Ellen saying that she did not want to go to an attorney because she did not want the premarital agreement at all.

William next argues that Ellen had a reasonable alternative—calling off the wedding—so there was no procedural unconscionability. But the reasonable-alternative consideration comes into play when considering whether duress was present. *Shanks*, 758 N.W.2d at 512–13. Procedural unconscionability turns on other considerations. *Id.* at 517–18.

Last, William argues that Ellen's compliance with the agreement and later execution of an amendment to it proves there was no procedural unconscionability

because she understood her obligations. But the determination of unconscionability is based on the circumstances "at the time the agreement is executed." *See In re Est. of Ascherl*, 445 N.W.2d 391, 393 (Iowa 1989); *accord In re Marriage of Maifield*, No. 03-0326, 2004 WL 61108, at *2 (Iowa Ct. App. Jan. 14, 2004) ("Whether a prenuptial agreement is reasonable is determined at the time the agreement is executed and not when enforcement is sought."). The district court found the credible evidence showed that when Ellen signed the agreement, she had no chance to review it. Giving deference to that finding, and rejecting William's other claims above, we affirm the district court's finding of procedural unconscionability.

We also agree with the court that the agreement was unenforceable because there was not a fair and reasonable disclosure of the values of the parties' financial assets. A fair and reasonable disclosure requires that each party have "'adequate knowledge' of the other party's property and financial obligations." *Shanks*, 758 N.W.2d at 519 (quoting Iowa Code § 596.8(3)). William is correct that there is no "exacting standard" requiring "precise valuations." *In re Est. of Laube*, No. 20-1399, 2022 WL 108937, at *3 (Iowa Ct. App. Jan. 12, 2022) (citation omitted). Yet a disclosure is not fair and reasonable absent evidence that the spouses knew the extent of each other's assets. *See Gutcher*, 2018 WL 5292082, at *3. That was missing here. We accordingly affirm the district court on this point as well.

### 2. Inherited Property

Moving on to the division of the parties' assets and debts in the second phase of the trial, Ellen testified that in 2013, she and William decided to buy a

home in Indiana for William's son to rent. They agreed to pay $89,900.00 for the home. The parties used $8900.00 from a home equity line of credit (HELOC) secured by their home in Urbandale for the down payment. They had opened the HELOC a couple of years earlier to help fund remodeling projects and the purchase of a home in Florida.[3] On the date of the closing in April 2013, the HELOC transaction documents show another $70,000.00 was drawn from the account.[4] Despite the use of these joint funds to buy the home in Indiana, it was deeded to William in his name alone. Ellen explained that, when William sent in the paperwork, she "wasn't there to sign it, so he put it in just his name and told [her] don't worry about it."

Ellen was upset when she learned that her name was not on the deed because the payments on the HELOC were largely funded by her income. She earned between $70,000.00 to $100,000.00 per year, while William had little to no income. Over the years, Ellen would give most of her income to William to be deposited into a joint bank account to pay their marital bills, which Ellen believed they were splitting equally. She thought William was withdrawing money from his retirement accounts to cover his share and then putting anything left over from what Ellen gave him into savings. After she filed for divorce, Ellen learned that William had not touched his retirement accounts during the marriage, and he had

---

[3] Ellen inherited $72,000.00 from her mother in February 2011. She testified that she signed the check over to William and gave him an additional $19,000.00 from her savings to go toward purchasing a home in Florida. That same month, the parties bought a home in Florida out of foreclosure for $131,500.00. According to Ellen, because William said he didn't have any funds available, the rest of the purchase price beyond what she provided was funded by the HELOC.

[4] It's not clear from the record where rest of the funds due at closing came from.

not saved any of her money. Instead, they were living off her assets while preserving his.

In December 2013, William inherited $367,618.83 from his mother. He received two more checks totaling $26,535.63 from his mother's estate a few months later. Ellen testified the plan was for William to pay off the HELOC balance with the inheritance and then deposit the remainder into a joint account. William initially deposited the $367,618.83 into the parties' joint checking account but, about two weeks later in January 2014, he made two withdrawals totaling $368,742.65. The first withdrawal was for $141,442.65, which William did use to pay off the HELOC balance. The second withdrawal for $227,300.00 went into a joint savings account, before being transferred by William in March—this time into his individual Charles Schwab account. The additional $26,535.63 that William received from his mother's estate was also deposited into that account in April.

Whatever happened to the Charles Schwab account next is a mystery. William testified that he transferred the money from the Charles Schwab account into a Merrill Edge account sometime in 2014. But he presented no documents supporting that testimony, even though Ellen asked for them in discovery. At the time of the trial, the balance of the Merrill Edge account was $180,000.00.

William testified most of that was from the sale of the Indiana home in 2015. The parties sold the property after William's son passed away that year, netting $165,882.83 in proceeds. While William said those proceeds were deposited into the Merrill Edge account, he did not produce any statements showing such a deposit was made. And William also testified that he used the proceeds from the sale of the Indiana property and his mother's inheritance to buy "several

vehicles"—a tri-glide motorcycle, a boat and trailer, a chopper motorcycle, a recreational vehicle, and a Mercedes, which collectively cost him "90-some-odd-thousand" dollars. Ellen, however, testified they bought and maintained those vehicles, including "repairs, title, tax, license fees, insurance," with joint funds.

The district court again found Ellen's testimony and documentary evidence to be more credible than William's. The court concluded the Indiana property was purchased and remodeled with joint HELOC funds, and the HELOC itself was obtained through Ellen's contributions to the marriage. As a result, the court determined the $180,000.00 balance in William's Merrill Edge account—which William testified included the $165,882.83 in proceeds from the sale of the Indiana property—was marital property to be equally divided between the parties. While the court acknowledged that William had paid off the HELOC with his inherited funds, it found that Ellen's income otherwise funded the revolving HELOC liability, which William used to pay for personal expenses during the marriage, with no contribution from William.

The court was "unpersuaded" that William used his inherited funds to buy the vehicles, given William's inability to trace those purchases to inherited funds. It also determined that William "elected to spend and/or comingle all of his inheritance with marital assets and liabilities." Because the evidence was "sketchy" and "not credible" about the values and ownership of the vehicles listed above—including the recreational vehicle, boat and trailer, tri-glide, and chopper— the court ordered these assets to be sold and the proceeds equally divided

between the parties. While the court awarded the Mercedes to William, it ordered that the vehicle's value be divided between the parties.

William argues that the court erred in dividing the proceeds from the sale of the Indiana property, which he maintains were deposited into his $180,000.00 Merrill Edge account, and ordering the sale of the vehicles because they were purchased with inherited funds. "Iowa Code section 598.21(5) and (6) require us to exempt inherited and gifted property from the typical property division in a dissolution unless doing so would be inequitable." *In re Marriage of Bast*, No. 22-1725, 2024 WL 1295551, at *5 (Iowa Ct. App. Mar. 27, 2024) (citation omitted). Giving deference to the court's credibility findings against William, we agree with its division of this property. *See In re Marriage of Williams*, 421 N.W.2d 160, 164 (Iowa Ct. App. 1988) ("A party who has not been fair and accountable with property under his or her control during the dissolution process must be charged accordingly.").

Even assuming the Indiana property was purchased and remodeled solely with inherited funds, which is not supported by the credible evidence in the record, we find that setting aside the proceeds from the sale of that property to William would be inequitable. Due to William's covert financial deception during the marriage, Ellen funded every aspect of the marital enterprise, to the tune of $250,000.00 to $350,000.00, while William contributed next to nothing despite having various retirement assets available. *See In re Marriage of McDermott*, 827 N.W.2d 671, 679 (Iowa 2013) (discussing factors to consider when deciding to exempt inherited property from marital division, including any matter that "would render it plainly unfair to a spouse . . . to have the property set aside for the

exclusive enjoyment" of the other). While "marriage does not come with a ledger," *In re Marriage of Fennelly*, 737 N.W.2d 97, 103 (Iowa 2007), we agree with the court that the circumstances of this one made it equitable to equally divide the Merrill Edge account. As for the vehicles that William says he bought with inherited funds, the only evidence William provided to support that claim was his own testimony, which the court found lacking in credibility. We again defer to that credibility finding and affirm the court's division of these assets.

### 3. HELOC Liability

William next argues that he should not be responsible for any of the remaining HELOC liability, which the district court ordered be divided equally between the parties, because the balance due "arises entirely from Ellen's unauthorized borrowing under the HELOC during this proceeding for her personal purposes in violation of the district court's order for preservation of assets."

Ellen testified that she used about $30,000.00 from the HELOC to cover some of her personal expenses during the dissolution proceeding. This included $20,000.00 in attorney fees, repairs to the roof of the Urbandale residence where she was residing during the divorce, and past due bills. Despite William's claims otherwise, we agree with the district court that Ellen's use of the HELOC wasn't in violation of the order preserving assets, since that order authorized use of funds for payment of routine expenses and "reasonable legal expense[s]." The record also shows that William continued to use marital funds for his ongoing expenses—necessary and unnecessary alike—during the proceedings. William's depletion of marital assets to cover his personal expenses had the same effect on the marital

estate as did Ellen's use of the HELOC for her personal expenses. Thus, it was not inequitable to require William to foot half the bill for the HELOC liability.

      *4.      Health Insurance*

As Ellen requested at trial, the district court ordered William to cover her under his employer-provided health insurance for thirty days after the entry of the decree or, in the event of an appeal, "until all appeals are completed." On appeal, William argues, as he did in a post-trial motion, that this requirement is not "allowed by law and constitutes an inequitable and improper impairment of his appeal rights, effectively penalizing him for taking an appeal." But, as Ellen points out, medical support in the form of health insurance payments constitutes spousal support, *see In re Marriage of Johnson*, 781 N.W.2d 553, 554 (Iowa 2010), and spousal support may be awarded for limited or indefinite periods of time following dissolution, Iowa Code § 598.21A(1). So William is incorrect that it was not "allowed by law." And the requirement does not penalize William, as he suggests; it instead provided a cost-effective stipend to Ellen so long as this expensive litigation continues. Nor did it impair William's appeal right since he appealed. Because William has not shown a failure to do equity, we affirm on this issue.

      *5.      Attorney Fees*

This leaves us with the district court's award of $50,000.00 in trial attorney fees to Ellen because of William's behavior during the proceedings—non-compliance with discovery, a revolving door of attorneys, and lack of support for his claims. William argues the award was entered "without any evidence or supporting findings regarding the actual amount of fees attributable to William's alleged unnecessary filings or discovery shortfalls." And he points out that he had

already paid some of Ellen's attorney fees due to discovery violations. Plus, William paid Ellen $10,000.00 in temporary attorney fees at the beginning of these proceedings, and he was ordered to share in the HELOC liability, which included another $20,000.00 to Ellen's attorney. On top of those amounts, William incurred $131,500 for his own attorney fees.

At trial, Ellen asked for an award of $94,000.00 in fees, which she said was roughly two-thirds of her overall fees. She filed an attorney-fee affidavit for $141,524.94 in support of that request. But the affidavit only stated the hourly rate for attorney and paralegal services, with no itemization or description of those services beyond the amounts billed and paid. Because the court had no itemization in making this large award, we cannot assess whether the fees awarded were "fair and reasonable." *See In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994) (requiring that awards of trial attorney fees "be fair and reasonable"). We are also unable to assess whether any of the fees were for the multiple contempts pursued by both parties, all of which were denied by the district court. *See Felton v. Iowa Dist. Ct.*, No. 21-1398, 2023 WL 1809820, at *6 (Iowa Ct. App. Feb. 8, 2023) (noting section 598.24 only authorizes taxing of attorney fees against a contemnor).

Under these unique circumstances, we modify the decree to vacate the attorney fee award and remand for redevelopment of the record and reconsideration of Ellen's request. *Cf. Hensler v. City of Davenport*, 790 N.W.2d 569, 589–90 (Iowa 2010) (vacating fee award and remanding for reconsideration in light of the level of the prevailing party's success). In doing so, we do not intend

to suggest that the amount should be more, less, or the same upon reconsideration.

Ellen also requests an award of $28,766.50 in appellate attorney fees, which is supported by an attorney fee affidavit and itemization. An award of appellate attorney fees is not a matter of right but rests within the appellate court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). The court "consider[s] the needs of the party making the request, the ability of the other party to pay," the relative merits of the appeal, and whether the party making the request had to defend the district court's decision on appeal. *See id.* After considering these factors, we conclude that Ellen should be awarded some amount of appellate attorney fees, but we remand that issue to the district court to determine with the issue of trial attorney fees. *See Ales v. Anderson, Gabelmann, Lower & Whitlow, P.C.*, 728 N.W.2d 832, 842 (Iowa 2007) (noting the "district court must look at the whole picture and . . . decide on a total fee appropriate for handling the complete case" (citation omitted)).

## III.    Conclusion

We affirm the district court on all issues except the award of trial attorney fees to Ellen. Because those fees were not supported by an itemization, we modify the decree to vacate the award and remand for reconsideration of trial attorney fees consistent with this opinion, together with Ellen's request for appellate attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS.**